Case No. 26-3330

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, and NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioners*,

v.

LEE ZELDIN, in his official capacity as U.S. Environmental Protection Agency Administrator; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and MICHAEL MARTUCCI, in his official capacity as Acting Regional Administrator for EPA Region IX,

*Respondents*,

ARIZONA CHAMBER OF COMMERCE & INDUSTRY, and

MARICOPA ASSOCIATION OF GOVERNMENTS

Respondent-Intervenors.

---

Petition for Review
of U.S. Environmental Protection Agency Final Action

---

**PETITIONERS' OPENING BRIEF**

---

**ORAL ARGUMENT REQUESTED**

Alexandra O. Schluntz
Ameya Gehi
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
(303) 996-9612
aschluntz@earthjustice.org
agehi@earthjustice.org

David Baron
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 745-5203
dbaron@earthjustice.org

Patrick Woolsey
Sierra Club Environmental
Law Program
2101 Webster Street Suite 1300
Oakland, CA 94612
(415) 977-5757
patrick.woolsey@sierraclub.org

*Counsel for Petitioner Sierra Club*

Abirami Vijayan
Meredith Hankins
Natural Resources Defense Council
1152 15th St. NW #300
Washington, DC 20005
(202) 836-9866
avijayan@nrdc.org
mhankins@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

Ryan Maher
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
(781) 325-6303

*Counsel for Petitioner Center for Biological Diversity*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 3

STATEMENT OF ISSUES ..... 3

STATUTORY ADDENDUM ..... 4

STATEMENT OF THE CASE ..... 4

I. Statutory and Regulatory Framework ..... 4

- A. The Clean Air Act's Ozone Pollution Program ..... 4
- B. Section 179B's Limited Waivers ..... 9
- C. The Exceptional Events Rule ..... 12

II. Factual Background and Administrative History ..... 14

- A. Phoenix's Decades-Long Ozone Nonattainment ..... 14
- B. Phoenix Did Not Attain the 2015 Ozone Standard by Its Deadline ..... 16
- C. MAG's 179B Demonstration ..... 17
- D. EPA's Critique and Approval of MAG's 179B Demonstration ..... 19

STANDING ..... 22

STANDARD OF REVIEW ..... 25

SUMMARY OF ARGUMENT ..... 26

ARGUMENT ..... 28

I. EPA's Action Violates the Clean Air Act Because Phoenix Failed to Implement Legally Required Pollution Controls ..... 28

- A. The Best Reading of the Statute Mandates that Phoenix Must Have Implemented Required Pollution Controls to Qualify for a 179B Waiver ..... 29
- B. EPA Deviates from Its Binding Rulemaking and Long-Standing Interpretation ..... 33

II. EPA Fails to Lawfully or Rationally Show that International Emissions Were the But-For Cause of Phoenix's Ozone Violations ..... 36

- A. EPA Ignores the Statutory But-For Standard and Evidence Contradicting Its Analysis ..... 37

1. MAG's Averaging Approach Obscures Seasonal Variations and Does Not Comport with the Statutory Standard for Ozone Nonattainment Areas ....................38

2. EPA Discounts Record Evidence That Contradicts MAG's Conclusions ....................42

B. EPA Illegally and Improperly Considers MAG's "Atypical Events" Demonstration by Circumventing the Act's Limits Related to "Exceptional Events" ....................46

C. EPA Arbitrarily Changes Its Policy on 179B Demonstrations Without Adequate Explanation Even Though the Facts Justifying the Policy Still Exist ....................50

D. EPA Arbitrarily Declares That Countervailing Evidence Supports the Weight of Evidence, Instead of Cutting Against It ....................54

III. EPA Unlawfully Excuses Adoption and Implementation of Contingency Measures ....................57

A. 179B Does Not Displace the Failure-to-Attain Trigger for Contingency Measures ....................58

B. Phoenix's Failure to Achieve Reasonable Further Progress Independently Triggers Contingency Measures ....................61

IV. Vacatur Is the Appropriate Remedy ....................63

CONCLUSION ....................65

## **ATTACHMENTS**

Attachment: Standing Declarations in Support

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Cmty. Action on Toxics v. EPA*,
180 F.4th 1188 (9th Cir. 2026) ....................42

*Alaska v. Nat'l Marine Fisheries Serv.*,
171 F.4th 1145 (9th Cir. 2026) ....................49

*Ass'n of Irritated Residents v. EPA*,
10 F.4th 937 (9th Cir. 2021) ....................24, 62, 63

*Bahr v. EPA*,
836 F.3d 1218 (9th Cir. 2016) ....................58, 60, 61

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*,
72 F.4th 284 (D.C. Cir. 2023)....................44

*Comm. for a Better Arvin v. EPA*,
185 F.4th 957 (9th Cir. 2026) ....................*passim*

*Connecticut v. EPA*,
696 F.2d 147 (2d Cir. 1982) ....................31

*Earth Island Inst. v. Hogarth*,
494 F.3d 757 (9th Cir. 2007) ....................53, 54

*Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. EPA*,
94 F.4th 77 (D.C. Cir. 2024).................... 5-6

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................50, 53

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)....................22, 23, 25

*Greater Yellowstone Coal. v. Servheen*,
665 F.3d. 1015 (9th Cir. 2011) ....................42

*Gundy v. United States*,
588 U.S. 128 (2019)....................................................................................29

*Hall v. Norton*,
266 F.3d 969 (9th Cir. 2001) ...........................................................................23

*Humane Soc'y of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ....................................................................53, 54

*Jeldness v. Pearce*,
30 F.3d 1220 (9th Cir. 1994) ......................................................................33, 59

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024).....................................................................25, 29, 36, 63

*Lopez v. Garland*,
116 F.4th 1032 (9th Cir. 2024) .........................................................................25

*MCI Telecomms. Corp. v. FCC*,
917 F.2d 30 (D.C. Cir. 1990).............................................................................49

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).........................................................................26, 36, 41

*Nat'l Parks Conservation Ass'n v. EPA*,
788 F.3d 1134 (9th Cir. 2015) ........................................................ 34, 40-41, 55

*NRDC v. EPA*,
507 F.2d 905 (9th Cir. 1974) .............................................................................23

*NRDC v. EPA*,
571 F.3d 1245 (D.C. Cir. 2009).........................................................................34

*NRDC v. Herrington*,
768 F.2d 1355 (D.C. Cir. 1985).........................................................................47

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) .............................................................................50

*Ober v. EPA*,
84 F.3d 304 (9th Cir. 1996) ...............................................................................64

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) (en banc) ............................................................54

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) ..........................................................................65

*Roe v. Critchfield*,
137 F.4th 912 (9th Cir. 2025) ................................................................ 32-33

*Safe Air for Everyone v. EPA*,
488 F.3d 1088 (9th Cir. 2007) ........................................................................64

*Safer Chemicals, Healthy Fams. v. EPA*,
943 F.3d 397 (9th Cir. 2019) ..........................................................................34

*Siang Ken Wang v. INS*,
413 F.2d 286 (9th Cir. 1969) ..........................................................................49

*Sierra Club v. EPA*,
294 F.3d 155 (D.C. Cir. 2002)..........................................................................59

*Sierra Club v. EPA*,
346 F.3d 955, *opinion amended on denial of reh'g*, 352 F.3d 1186
(9th Cir. 2003)..............................................................................................*passim*

*Union Elec. Co. v. EPA*,
427 U.S. 246 (1976)...........................................................................................4

*United States v. Kittson*,
161 F.4th 619 (9th Cir. 2025) ..........................................................................32

*United States v. Nishiie*,
996 F.3d 1013 (9th Cir. 2021) ........................................................................62

*West Virginia v. EPA*,
597 U.S. 697 (2022)..........................................................................................25

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001).................................................................... 33, 46-47

**Statutes**

5 U.S.C. § 706(2)(A)......................................................................................25

42 U.S.C. § 7401(b)(1)........................................................................... 4-5

42 U.S.C. § 7401(c) ...............................................................................30

42 U.S.C. § 7407(d)(1)..............................................................................5

42 U.S.C. § 7409(b) .................................................................................5

42 U.S.C. § 7410(k) .................................................................................6

42 U.S.C. § 7502 .................................................................................6, 32

42 U.S.C. § 7502(b) ...............................................................................31

42 U.S.C. § 7502(c) ...........................................................................5, 31

42 U.S.C. § 7502(c)(1)..............................................................................6

42 U.S.C. § 7502(c)(9)....................................................................*passim*

42 U.S.C. § 7509(a)(1)............................................................................32

42 U.S.C. § 7509a .................................................................................59

42 U.S.C. § 7509a(a)................................................................................9

42 U.S.C. § 7509a(a)-(b)...........................................................................9

42 U.S.C. § 7509a(b) .........................................................................10, 37

42 U.S.C. § 7509a(a)(1)-(2).....................................................................10

42 U.S.C. § 7511(a) .................................................................................5

42 U.S.C. § 7511(a)(1)..........................................................................5, 8

42 U.S.C. § 7511(a)(5)............................................................................10

42 U.S.C. § 7511(b)(1)..............................................................................5

42 U.S.C. § 7511(b)(2)...............................................................8, 9, 10, 60

42 U.S.C. § 7511a ..............................................................................9, 32

42 U.S.C. § 7511a(b) .........................................................................15, 31

42 U.S.C. § 7511a(b)(1) ........ 7
42 U.S.C. § 7511a(b)(1)(a)(i) ........ 6
42 U.S.C. § 7511a(b)(2) ........ 7
42 U.S.C. § 7511a(c) ........ 8
42 U.S.C. § 7511a(c)(9) ........ 62
42 U.S.C. § 7511a(g) ........ 62
42 U.S.C. § 7511d ........ 10
42 U.S.C. § 7607(b)(1) ........ 3
42 U.S.C. § 7619(b)(1)(B) ........ 13
42 U.S.C. § 7619(b)(2)(B) ........ 13
42 U.S.C. § 7619(b)(3)(B)(ii) ........ 13, 19, 47
42 U.S.C. § 7619(b)(3)(B)(iv) ........ 13, 46, 48, 49
42 U.S.C. § 7619(b)(1)(B)(i)-(iii) ........ 47

**Regulations**

40 C.F.R. Pt. 50, App. U ........ 8, 37
40 C.F.R. § 50.1(l) ........ 8
40 C.F.R. § 50.14 ........ 13
40 C.F.R. § 50.14(a)(1)(i)(C) ........ 46, 48
40 C.F.R. § 50.14(a)(1)(ii) ........ 13
40 C.F.R. § 50.14(b)(4) ........ 13, 47
40 C.F.R. § 50.14(c)(2)(ii) ........ 47
40 C.F.R. § 50.14(c)(3)(i) ........ 47
40 C.F.R. § 50.14(c)(3)(iv)(B) ........ 13, 19, 47

40 C.F.R. § 50.14(c)(3)(iv)(C) ........ 13, 14

40 C.F.R. § 50.14(c)(3)(v) ........ 14

40 C.F.R. § 50.19 ........ 8, 39

40 C.F.R. § 51.1300(b) ........ 8, 39

40 C.F.R. § 51.1308 ........ 7, 31

40 C.F.R. § 51.1310 ........ 6

40 C.F.R. § 51.1312 ........ 31

40 C.F.R. § 51.1312(a) ........ 7

40 C.F.R. § 51.1312(c) ........ 6

40 C.F.R. § 51.1318 ........ 59

**Federal Register**

43 Fed. Reg. 8962 (Mar. 3, 1978) ........ 14

57 Fed. Reg. 13498 (Apr. 16, 1992) ........ 63

66 Fed. Reg. 29230 (May 30, 2001) ........ 14

79 Fed. Reg. 55645 (Sept. 17, 2014) ........ 14

80 Fed. Reg. 65292 (Oct. 26, 2015) ........ *passim*

81 Fed. Reg. 81276 (Nov. 17, 2016) ........ 7, 30, 36, 61

83 Fed. Reg. 25776 (June 4, 2018) ........ 14-15

83 Fed. Reg. 62998 (Dec. 6, 2018) ........ 11, 34, 35

85 Fed. Reg. 87256 (Dec. 31, 2020) ........ 4

86 Fed. Reg. 1105 (Jan. 7, 2021). ........ 11

87 Fed. Reg. 50030 (Aug. 15, 2022) ........ 51

87 Fed. Reg. 60897 (Oct. 7, 2022) ........ 15, 31, 51

88 Fed. Reg. 71757 (Oct. 18, 2023)....................15
90 Fed. Reg. 43955 (Sept. 11, 2025)....................16
90 Fed. Reg. 43983 (Sept. 11, 2025)....................16
90 Fed. Reg. 52019 tbl. 1 (Nov. 19, 2025)....................*passim*
90 Fed. Reg. 57370 (Dec. 11, 2025)....................16
91 Fed. Reg. 13777 (Mar. 13, 2026)....................*passim*

**Other Authorities**

136 Cong. Rec. S4121 (1990) (statement of Sen. Gramm)....................30

# INTRODUCTION

Petitioners Sierra Club, Center for Biological Diversity, and Natural Resources Defense Council (collectively, Public Interest Petitioners) seek vacatur of EPA's final action determining that the Phoenix-Mesa nonattainment area (Phoenix) would have met the national air quality standard for ozone but for international emissions. EPA's action violates the Clean Air Act and is arbitrary and capricious.

Ozone is one of the most dangerous air pollutants in the United States, linked to lung damage, cardiovascular harms, and premature deaths. Residents in the Phoenix area are exposed to profoundly unsafe ozone levels that violate the national standard set to protect public health and the environment: the area suffers from the fourth-highest ozone pollution levels in the nation. Although the Clean Air Act requires states to meet the ozone standard by specific deadlines through the implementation of pollution control measures, Arizona failed to timely implement the required controls. Despite that failure, EPA accepted the Maricopa Association of Governments' (MAG) attempts to blame Phoenix's pollution problem on international emissions from unidentified sources as far away as Asia, granting Phoenix a waiver that allows it to evade taking stronger measures addressing local pollution sources.

In issuing the waiver, EPA runs roughshod over the Clean Air Act's strict limitations. The agency dispenses with its own longstanding interpretation of the Act and—for the first time—allows a nonattainment area to qualify for a waiver despite its documented failures to implement all legally required pollution control measures.

EPA's determination also relies on a legally flawed and arbitrary "weight-of-evidence" analysis that is not rationally explained or supported by the record. MAG's deficient pollution modeling analysis was intended to prove that emissions from Asia and Mexico, rather than a variety of local pollution sources, cause Phoenix's unhealthy ozone levels. But the analysis erroneously relies on averages instead of examining the data that actually matters for determining compliance with the ozone standard—the sources of pollution on specific high-ozone days. EPA also arbitrarily ignores contradictory evidence and its own prior technical findings, while giving considerable weight to data that fails to meet statutory requirements and to evidence that EPA itself finds inconsistent.

In addition to granting the waiver, EPA impermissibly excuses Arizona from implementing back-up pollution controls in Phoenix that the Act requires precisely in this circumstance: when an area fails to timely bring ozone levels into compliance with the national standard. EPA's determination must be vacated.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1). Public Interest Petitioners timely filed their petition for review on May 22, 2026, within sixty days of the publication of EPA's final action. Because this action pertains to Phoenix, venue is appropriate in the Ninth Circuit. *Id.*

## STATEMENT OF ISSUES

1. Did EPA violate the Clean Air Act by finding that international emissions were the but-for cause of Phoenix's ozone nonattainment even though the area failed to reduce local ozone pollution as required by the statute?

2. Is EPA's determination that international emissions were the but-for cause of Phoenix's nonattainment arbitrary and capricious when the record evidence does not show that international emissions caused specific exceedances of the ozone standard, and EPA ignores its prior technical findings and countervailing evidence, unlawfully considers data that failed to meet statutory requirements, and makes inconsistent findings?

3. Did EPA violate the Clean Air Act by excusing Phoenix from adopting and implementing additional pollution-reduction controls known as contingency measures, based on international emissions?

**ADDENDUM**

Under Circuit Rule 28-2.7, an addendum with pertinent statutes, legislative history, and regulations accompanies this brief.

**STATEMENT OF THE CASE**

## I. Statutory and Regulatory Framework

### A. The Clean Air Act's Ozone Pollution Program

Ozone pollution—the main ingredient in smog—is detrimental to human health and the environment. Acute exposure to ozone can lead to shortness of breath, coughing, asthma attacks, increased risk of respiratory infections, and increased susceptibility to pulmonary inflammation. 85 Fed. Reg. 87256, 87268-70 (Dec. 31, 2020). Studies also suggest that exposure to ozone causes complications to the cardiovascular, reproductive, and nervous systems, as well as premature death. *Id.* at 87268 n.45. Ozone also causes serious harm to vegetation, including leaf damage and decreased photosynthesis. *Id.* at 87310. The reduction in green cover consequently damages ecosystem functions, such as air pollution removal, climate and water regulation, erosion control, and carbon sequestration. *Id.* at 87310-13.

The nation's "serious and otherwise uncheckable problem of air pollution" led Congress to adopt the Clean Air Act as "a drastic remedy." *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976). To "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare," 42 U.S.C. §

7401(b)(1), Congress directed EPA to promulgate, and revise as necessary, National Ambient Air Quality Standards (NAAQS), *id.* § 7409(b). These standards cap the maximum concentration of dangerous pollutants like ozone allowed in the ambient air breathed by everyone in the nation. The most recently revised standard for ozone (the standard relevant to this case) limits the concentration to 70 parts per billion (ppb). 80 Fed. Reg. 65292, 65292 (Oct. 26, 2015).

After EPA promulgates or revises a standard, the agency must designate whether each area of the country meets or violates it. 42 U.S.C. § 7407(d)(1). For areas not meeting the ozone standard, known as nonattainment areas, EPA assigns initial classifications based on each area's air quality, which ascend in severity: Marginal, Moderate, Serious, Severe, and Extreme. *See id.* § 7511(a)(1). These nonattainment areas must attain the standard "as expeditiously as practicable," but no later than the attainment deadlines established by the statute for each level of severity. *Id.* § 7511(a)(1), (b)(1). To ensure that areas do so, the Act requires states to develop forward-looking strategies and pollution reduction measures, submitted as part of a State Implementation Plan (SIP). *Id.* § 7502(c) (nonattainment SIPs generally), § 7511(a) (ozone nonattainment SIPs).

Within a SIP, "the most important" requirement is the inclusion of "'‘enforceable emission limitations and other control measures'" to reduce pollution. *Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. EPA*, 94

F.4th 77, 85 (D.C. Cir. 2024) (quoting 42 U.S.C. § 7410). Ozone is not emitted directly by pollution sources; it forms when its precursors, nitrogen oxides ($NO_X$) and volatile organic compounds (VOC), react in the presence of sunlight and heat. 7-ER-1110. Accordingly, regulators must reduce these precursors, which are directly emitted from a variety of sources like vehicles, power plants, and factories. Moderate and above ozone nonattainment SIPs must include air modeling of the planned control measures demonstrating that the state's plan will suffice to bring the area into attainment by the deadline. *See* 80 Fed. Reg. at 65437.

EPA is responsible for reviewing and approving SIPs to ensure compliance with the Clean Air Act. 42 U.S.C. § 7410(k). The Act specifies the required scope and effect of control measures, which vary depending on the area's classification. *Id.* § 7502. For example, Moderate areas must:

- Achieve "reasonable further progress" toward the ozone standard by implementing control measures that reduce VOC emissions by "at least 15 percent from baseline emissions." *Id.* § 7511a(b)(1)(A)(i).[1]
- Implement "reasonably available control measures" (RACM) on existing sources "as expeditiously as practicable." *Id.* § 7502(c)(1); *see* 40 C.F.R. § 51.1312(c). To meet the RACM requirements, air agencies must "adopt[] all

[1] EPA allows ozone nonattainment areas to rely on reductions in $NO_X$ emissions to meet reasonable further progress requirements in certain circumstances. 40 C.F.R. § 51.1310.

reasonable measures…to meet [reasonable further progress] requirements and to demonstrate attainment" with the ozone standard. 81 Fed. Reg. 81276, 81281 (Nov. 17, 2016). RACM includes a broad set of strategies, and the requirements extend to pollution sources outside of the nonattainment area but within the state's jurisdiction. *Id.*

- Implement "reasonably available control technology" (RACT) on major sources of ozone precursors. 42 U.S.C. § 7511a(b)(2); 40 C.F.R. § 51.1312(a). RACT, a distinct subset of RACM, requires implementation of established pollution control technologies for large stationary sources (such as industrial and commercial facilities) within the nonattainment area.
- Submit an attainment demonstration showing that the SIP's planned reductions in $NO_X$ and VOC emissions will actually achieve attainment. 40 C.F.R. § 51.1308; *see* 42 U.S.C. § 7511a(b)(1).
- Provide for "[c]ontingency measures," which are additional control measures that will kick in automatically to achieve meaningful pollution reductions if the SIP's primary emission control strategies fail. 42 U.S.C. § 7502(c)(9). These measures will "be undertaken" if the area either fails to make reasonable further progress or fails to timely attain. *Id.*

Serious areas must undertake more stringent requirements—for example, RACT requirements apply to a broader set of stationary sources, stronger pollution

controls apply to new sources, and additional average 3% progress reductions in precursors are required annually. *See id.* § 7511a(c).

EPA is required to determine whether an area has attained the ozone standard by the statutory deadline and reclassify areas that fail to timely attain to a higher level of severity. *Id.* § 7511(b)(2). Regulators and the public generally rely on a nationwide network of ozone monitors to identify individual exceedances of the standard as well as attainment status. When a single reading at a monitor is 71 ppb or higher, it is called an exceedance of the 2015 ozone standard. 40 C.F.R. § 50.1(l). An area fails to attain the standard when its calculated "design value," based on three years of monitoring data, violates the ozone standard. 42 U.S.C § 7511(a)(1). For each year, the relevant data point is the fourth-highest reading for each monitor. 40 C.F.R. Pt. 50, App. U. Each monitor's design value is the average of the three years' fourth-highest readings, and the monitor with the highest design value defines the area's design value. 40 C.F.R. §§ 50.19, 51.1300(b); *see* 2-ER-281 n.3. For example, in Phoenix, the Mesa monitor's fourth-highest reading was 83 ppb in 2021; 78 ppb in 2022; and 80 ppb in 2023. 90 Fed. Reg. 52019, 52024-25 tbl. 1 (Nov. 19, 2025). The Mesa monitor's 2023 design value is the average of those readings: 80 ppb. *Id.* Other monitors' design values ranged from 70 to 80 ppb. *Id.* Phoenix's 2023 design value is thus 80 ppb, surpassing the national standard of 70 ppb. *Id.*

If the design value exceeds the ozone standard, EPA must determine that the area has failed to timely attain, and the area is reclassified by operation of law to the next level—so a Moderate area would be reclassified to Serious, with a new attainment deadline. 42 U.S.C. § 7511(b)(2). Such reclassification subjects the area to more stringent nonattainment planning and control requirements. *Id.* § 7511a. The reclassified area must then submit a new plan that comports with the new classification's more stringent requirements. *Id.*

### B. Section 179B's Limited Waivers

Section 179B of the Act, titled "International border areas," accounts for the impact of international emissions on ozone nonattainment areas with two narrowly tailored provisions.[2] 42 U.S.C. § 7509a(a)-(b). The provisions contain strict qualification criteria and, even when an area qualifies, waive only a limited subset of the Act's requirements. First, 179B(a) provides a prospective waiver to states submitting a SIP for an area still in its planning stages (*i.e.*, *before* the attainment deadline has passed), allowing EPA to approve the SIP even if the state cannot show that its plan will result in timely attainment. *Id.* § 7509a(a). EPA can do so only if (1) the plan "meets all the requirements applicable to it," such as providing for required pollution controls, and (2) the state shows the SIP "would be adequate

[2] All discussion of international emissions in this brief refers to international manmade, or anthropogenic, emissions.

to [timely] attain…but for emissions emanating from outside of the United States." *Id.* § 7509a(a)(1)-(2).

Second, 179B(b) provides a retrospective waiver to areas that failed to attain by the deadline. *Id.* § 7509a(b). It exempts ozone nonattainment areas from reclassification if EPA determines that the area "would have attained the [ozone standard] by the applicable attainment date, but for emissions emanating from outside of the United States." *Id.* This case involves an improper retrospective waiver.

The three statutory provisions that 179B(b) exempts are sections 7511(b)(2), 7511(a)(5), and 7511d of Title 42.[3] Section 7511(b)(2) contains the requirement for EPA to reclassify an ozone nonattainment area based on the agency's finding of nonattainment. The other two exempted provisions concern extensions of the attainment deadline and penalties applicable to Severe and Extreme areas. Section 179B(b) does not waive any other nonattainment planning or SIP requirements.

EPA explained how 179B's provisions relate to the 2015 ozone standard when it issued implementing regulations for the standard. Specifically, the agency determined that 179B does not "relax[]" any "mandatory emissions control measures (including contingency measures)." 80 Fed. Reg. at 65444. The agency

[3] The text of 179B(b) refers to "section 7511(a)(2)," rather than (b)(2). EPA routinely assumes that 179B(b) was intended to refer to Section 7511(b)(2). *E.g.*, 91 Fed. Reg. 13777, 13778 n.4 (Mar. 13, 2026).

further took final action confirming that RACM and RACT implementation is a prerequisite to 179B(b) eligibility for Moderate and higher areas. 83 Fed. Reg. 62998, 63010 (Dec. 6, 2018).

EPA also published detailed guidance on 179B demonstrations in 2020, after public notice and comment. 86 Fed. Reg. 1105, 1106 (Jan. 7, 2021). The 2020 Guidance described the type of evidence that states should submit. 7-ER-1161-1218. Explaining the commonsense point that the impact of international emissions "is clearer in some cases than others," the 2020 Guidance enumerates certain circumstances necessitating a more detailed demonstration. 7-ER-1188. In identifying those circumstances, EPA considered forward-looking air pollution modeling that the agency had conducted for the year 2023. 7-ER-1188-1189. That modeling, conducted nationwide, established that international contributions are much larger in areas located directly across the border from large pollution sources. *Id.* Such contributions in border locations can be up to twenty times greater than in non-border areas like Phoenix.[4] *See* 7-ER-1189 fig. 3. In addition, EPA noted that a 179B demonstration is "more compelling" when international contributions are larger on exceedance days compared to non-exceedance days. 7-ER-1209,1203.

---

[4] The Phoenix nonattainment area is 100 miles from the U.S.-Mexico border at its closest point and 220 miles at its farthest point (as well as 7,000+ miles from Asian and other intercontinental sources). 2-ER-151.

The guidance also called for consideration of any contradictory evidence, including evidence that violations of the ozone standard could be attributed to U.S. sources rather than international ones. 7-ER-1172. The year after issuing the guidance, EPA published additional modeling examining domestic versus international contributions to ozone levels between 2018 to 2020 at locations nationwide (the 2021 Modeling Memorandum). 7-ER-1159. Those efforts estimated that domestic emissions contributed nearly five times more than international emissions to Phoenix's ozone levels. *See id.*

In 2025, EPA summarily rescinded the 2020 Guidance in a press release, deeming it "cumbersome red tape" and explaining that the agency's new goal is to "develop the evidence necessary to grant" more 179B waivers. 7-ER-1106. EPA's announcement did not claim the 2020 Guidance was substantively unsound, offer any basis for questioning the legal, technical, and analytical conclusions therein, or explain how its new approach—first announced in its proposed 179B(b) waiver for Phoenix—comports with 179B's limits. 7-ER-1106-1107.

### C. The Exceptional Events Rule

Separate from its provisions concerning international emissions, the Clean Air Act recognizes that certain unique natural events or human activities can cause air pollution but are not reasonably controllable. The Act prescribes a process for EPA to exclude a subset of air quality monitoring data influenced by "exceptional

events" from determinations concerning "exceedances or violations of the national ambient air quality standards." 42 U.S.C. § 7619(b)(3)(B)(iv); *see* 40 C.F.R. § 50.14(a)(1)(ii). Not all events qualify as "exceptional;" for example, "meteorological event[s] involving high temperatures or lack of precipitation" do not, 42 U.S.C. § 7619(b)(1)(B), but wildfires can, 40 C.F.R. § 50.14(b)(4). EPA's determination here considered wildfire impacts but did so without following the prescribed process for excluding that impact as an exceptional event. 90 Fed. Reg. at 52025.

The statute mandates that EPA promulgate regulations governing the review and handling of air quality monitoring data influenced by an exceptional event, and both the statute and EPA's implementing regulation (the Exceptional Events Rule) establish minimum requirements before EPA may exclude exceptional events. 42 U.S.C. § 7619(b)(2)(B); 40 C.F.R. § 50.14. A state's demonstration seeking to exclude exceptional events data must establish a "clear causal relationship between the specific event and the monitored exceedance or violation." 40 C.F.R. § 50.14(c)(3)(iv)(B); *see* 42 U.S.C. § 7619(b)(3)(B)(ii). The Exceptional Events Rule details further requirements, including an explanation of how the exceptional emissions led to the exceedance, 40 C.F.R. § 50.14(c)(3)(iv)(C), "[a]nalyses comparing the claimed event-influenced concentration(s) to concentrations at the

same monitoring site at other times," *id.*, and a minimum thirty-day public comment period on exceptional events demonstrations, *id.* § 50.14(c)(3)(v).

## II. Factual Background and Administrative History

### A. Phoenix's Decades-Long Ozone Nonattainment

For decades, unhealthy ground-level ozone pollution has been the norm in Phoenix. 43 Fed. Reg. 8962, 8968 (Mar. 3, 1978). The nonattainment area covers the metropolitan area of Phoenix, Mesa, and Scottsdale, home to nearly four million residents[5] and hundreds of polluting sources, including power plants, oil tank farms, and airports. 4-ER-527-547. In 1978, EPA found that Phoenix's ozone levels violated the Clean Air Act's first ozone standard. 43 Fed. Reg. at 8968. Since then, as more scientific research on ozone's health harms has become available, EPA has strengthened the standard three times. *E.g.*, 90 Fed. Reg. at 52020. Air quality in Phoenix has routinely violated these standards, and in 2025, Phoenix residents suffered from the fourth-worst ozone pollution levels in the country. *See, e.g.*, 66 Fed. Reg. 29230 (May 30, 2001); 79 Fed. Reg. 55645 (Sept. 17, 2014); 2-ER-177.

In 2018, EPA classified Phoenix as a Marginal nonattainment area for the 2015 ozone standard, setting an August 2021 attainment deadline. 83 Fed. Reg.

---

[5] EPA, *8-Hour Ozone (2015) Nonattainment Areas by State/County/Area*, https://perma.cc/QC9L-H8LM (last visited Sept. 25, 2026).

25776, 25784 (June 4, 2018). In 2022, after the area failed to attain by the deadline, EPA reclassified Phoenix to Moderate nonattainment. 87 Fed. Reg. 60897, 60913 (Oct. 7, 2022). This obligated Arizona to submit a new SIP and implement RACM and RACT for Phoenix by January 1, 2023. *Id.* at 60900. EPA set a new attainment deadline of August 3, 2024. *Id.* at 60903. The area was also required to achieve reasonable further progress and adopt contingency measures, among other requirements. *See id.* at 60899-900 (citing 42 U.S.C. § 7511a(b)).

Yet the Maricopa Association of Governments (MAG), the regional air quality planning agency that develops Phoenix's SIP, did not submit its Moderate plan to EPA until April 2025, more than two years after the SIP submittal deadline and eight months after the attainment deadline. *See* 88 Fed. Reg. 71757, 71758 (Oct. 18, 2023) (finding of failure to submit); *see also* 2-ER-139. MAG's SIP submittal contained significant deficiencies, failing to provide for the required control measures; the state of Arizona accordingly did not timely implement the required controls. *See* 2-ER-140-141. MAG failed entirely to conduct a RACM analysis, and Arizona did not implement RACM for existing sources. SIP Submittal at 5 & n.14, 20-21;[6] *see* 2-ER-140. And Arizona failed to implement

---

[6] MAG 2025 Eight-Hour Ozone Plan – Submittal of Applicable Moderate Area Requirements for the Maricopa Nonattainment Area (2025), https://azmag.gov/portals/0/Environmental/Air-Quality/2025/Final-MAG-2025-Eight-Hour-Ozone-Plan-4-23-25.pdf [hereinafter SIP Submittal].

adequate RACT for certain sources of ozone precursors. SIP Submittal at 6-8. For example, Arizona untimely adopted RACT for gas stations and surface coatings in Pinal County and for solvent cleaning in Maricopa County. *Id.*; *see* 2-ER-140. MAG's plan also admitted that it failed to meet the reasonable further progress requirements. SIP Submittal at ES-3, 15-21; *see* 2-ER-140.

EPA has not acted on the entire Moderate SIP, so Phoenix remains without an EPA-approved, federally enforceable plan to reduce ozone. *See, e.g.*, 90 Fed. Reg. 43983, 43985 (Sept. 11, 2025) (proposing to approve parts of the SIP but not evaluating for RACT purposes); 90 Fed. Reg. 43955, 43956 (Sept. 11, 2025) (deferring evaluation of contingency measures' sufficiency); 90 Fed. Reg. 57370 (Dec. 11, 2025) (final partial limited SIP approval).

### B. Phoenix Did Not Attain the 2015 Ozone Standard by Its Deadline

Based on monitoring data for 2021 to 2023, Phoenix's 2023 design value was 80 ppb, well above the 70 ppb standard. 91 Fed. Reg. at 13778. Therefore, after its SIP failed to include all required control measures on local pollution sources, Phoenix "did not attain" the standard by a significant margin, which ordinarily would result in reclassification to Serious status. *Id.* Ozone levels exceeding the national standard in Phoenix usually occur during April through September. 3-ER-336 n.5. During 2021-2023, most of Phoenix's high ozone days occurred in summer. 2-ER-310.

### C. MAG's 179B Demonstration

Just a few months after submitting its tardy and insufficient state implementation plan, MAG submitted a 179B(b) retrospective demonstration purporting to show that international emissions were the but-for cause of Phoenix's nonattainment. 3-ER-321,328. MAG's demonstration does not identify specific sources of international emissions; instead, it blames pollution from unnamed sources at unidentified locations as distant as Asia (which at some locations is more than 7,000 miles away) and elsewhere. *See* 3-ER-397-400 (discussing generalized transport patterns, not specific sources of pollution). In the demonstration, MAG attempts to estimate average international emission contributions at each ozone monitor. *See* 5-ER-664,669-670. MAG then removes those average international contributions from each monitor's design value and contends that, without those international contributions, the area would have timely attained. 5-ER-669-670. MAG does not estimate international contributions to specific exceedances, such as the four highest readings at each monitor during each year.

MAG's demonstration contains multiple parts, including: (1) an analysis of transport patterns, which uses a tool called HYSPLIT to attempt to track wind patterns preceding high ozone days in Phoenix, but does not attempt to quantify international contributions; (2) a precursor emissions analysis, examining trends in

$NO_X$ and VOC inventories; (3) photochemical modeling that attempts to quantify the international ozone impact on Phoenix during the attainment period; and (4) an analysis of Phoenix ozone levels excluding, without complying with EPA's Exceptional Events Rule, thirty-one allegedly "atypical" wildfire-impacted exceedance days. 3-ER-333-334,377,381.

MAG's "most direct line of evidence," the photochemical model, purports to estimate an average international contribution at each monitor. 3-ER-357. The photochemical model works by first creating a base case model, which attempts to recreate Phoenix's conditions and ozone levels in 2023. 3-ER-418. That base model does not fully reflect reality: for example, the modeled exceedance days mostly occurred in the spring, while most actual exceedance days occurred during the summer. 2-ER-310. The model is then run for a second time, excluding estimated international emissions. 3-ER-418. The difference in ozone levels between the two models is used to calculate a "Relative Response Factor" for each monitor, which is meant to reflect average international contributions. *Id.* But to calculate this relative response factor, MAG averages international contributions only across the top ten modeled (not actual) exceedance days. 2-ER-310. MAG estimates that international contributions are highest during April through June, and during that time frame any international transport mostly originated in Asia. 3-

ER-358 fig. 3-2. During the period with peak ozone levels (July-August), any international transport that occurred mostly originated in Mexico. 3-ER-331.

MAG's "atypical" events analysis purports to establish that thirty-one exceedance days over the three-year period were "atypical" due to the impacts of wildfire smoke. 6-ER-843. MAG asserts that it could ignore data on those days without following statutory and regulatory requirements to prove that smoke caused the exceedance. 3-ER-339-341; *see* 42 U.S.C. § 7619(b)(3)(B)(ii); 40 C.F.R. § 50.14(c)(3)(iv)(B). In addition to removing wildfire-impacted days from the photochemical modeling, MAG excludes data from each of the thirty-one exceedance days to recalculate downward each monitor's design value. 3-ER-331,334,339; 6-ER-846.

### D. EPA's Critique and Approval of MAG's 179B Demonstration

In its review of MAG's demonstration, EPA purports to apply a "weight of evidence" approach to examine MAG's various analyses "collectively," in recognition of the "extensive number of technical factors" at play. 90 Fed. Reg. at 52023, 52029. In this weight-of-evidence assessment, EPA identifies numerous flaws in every major piece of MAG's demonstration. *See* 2-ER-153-164. For example, EPA flags four issues with MAG's transport and precursor analyses. First, EPA notes that even after MAG removed data from every date purportedly impacted by Mexican transport as well as wildfire smoke, Phoenix still did not

show attainment. 2-ER-298. Second, EPA explains that the transport analysis over-excluded potential Mexican transport days, because those days could have included emissions generated in the United States that merely passed over Mexico before entering the Phoenix area. 2-ER-312. EPA recognizes that HYSPLIT "cannot distinguish between emissions originating from the U.S. and passing through Mexico from those originating from Mexico." 2-ER-110. Third, EPA finds that "there is not enough information" to establish that all northern and western trajectories of emissions came from Asia and Canada, rather than from sources within the United States. 2-ER-311. Fourth, EPA noted "uncertainties" in MAG's precursor emission trend, explaining that "satellite data did *not* show consistent decrease in" local nitrogen dioxide after 2014. 2-ER-308 (emphasis added). EPA further reasoned it "is difficult to conclude" from the precursor analysis "that an increase in Mexican emissions contributed to exceedances." 2-ER-311.

Critiquing the photochemical modeling, EPA notes that the model's failure to account for seasonal variations "could lead to an overestimated contribution from international emissions." 2-ER-310. EPA previously faulted MAG's technique: for a similar demonstration submitted by Utah, EPA explained that "simply subtract[ing] the modeled international contribution from the design value" is not the correct interpretation of the 179B but-for standard. 7-ER-1140. Additionally, regarding the atypical events analysis, EPA finds "inconclusive" the

evidence showing that fire emissions "enhanced" ozone levels on the thirty-one specified exceedance days. 2-ER-278.

Despite these flaws, EPA approves MAG's 179B demonstration, stating that the photochemical modeling was "acceptable," and that its results "were further supported" by the trajectory analysis, precursor analysis, and atypical events analysis. 2-ER-317. In making those findings, EPA "no longer considers" the factors set forth in the 2020 Guidance, such as specific characteristics suggesting the need for additional evidence. 91 Fed. Reg. at 13779. In particular, EPA dispenses with the requirement for additional evidence for non-border areas, 90 Fed. Reg. 52023 n.31, and indeed, Phoenix's 179B waiver marks the first time EPA has approved such a waiver for a non-border area. Because EPA approved the waiver, Phoenix maintains its Moderate status, instead of reclassification to Serious and the accompanying additional emission controls. 91 Fed. Reg. at 13777-78.

In issuing its approval, EPA finds that in order to qualify for a 179B waiver, "states will no longer be expected to show that they could not attain with…controls required to be implemented by the attainment date." *Id.* at 13779. EPA also determines that, despite the fact that Phoenix "did not attain the 2015 ozone [standard]" by the deadline, *id.* at 13778, Arizona is "no longer required to submit…contingency measures," *id.* at 13780; *see also* 90 Fed. Reg. at 52029 ("the contingency measure requirements…no longer apply"). In other words, because of

purported pollution originating thousands of miles away, EPA has excused the area from taking any additional action beyond its preexisting Moderate-area requirements to reduce local pollution within the state's control.

## STANDING

Public Interest Petitioners have standing to challenge EPA's 179B waiver because their members live, work, or recreate in Phoenix and suffer from exposure to harmful ozone levels. EPA's 179B action waives stronger ozone pollution control measures that would otherwise be required in Phoenix, thereby prolonging members' exposure to unsafe levels of ozone pollution.

An organization has standing to bring an action on behalf of its members if: (1) neither the claim asserted nor the relief requested require their members to participate directly in this lawsuit; (2) they seek to protect their members from harmful ozone pollution, which is germane to their purpose; and (3) their members would have standing to sue individually. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000).

Direct participation of the members of Petitioners is not necessary in this case, and the interests that Petitioners seek to advance through this litigation fall squarely within each of their organizations' respective missions. Bahr Decl. ¶¶ 5-6, 9-12, 23-32; Evans Decl. ¶¶ 2-3, 5-7, 11-12; Trujillo Decl. ¶¶ 2-4, 7.

Each petitioning organization has members with standing to sue individually because (1) they suffer an "injury in fact" that is concrete and particularized, and actual or imminent; (2) the injury is "fairly traceable" to EPA's unlawful 179B waiver; and (3) it is likely that a favorable decision will redress their injuries. *Laidlaw*, 528 U.S. at 180-81.

First, Petitioners' members are injured because they live, work, and recreate in the Phoenix area and are exposed to elevated levels of ozone pollution when walking, running, biking, hiking, birding, and gardening. Ukeiley Decl. ¶¶ 3, 6; Reinhart Decl. ¶¶ 3-4, 6-7; Quayle Decl. ¶ 7; Ricker Decl. ¶ 7; Ahlberg Decl. ¶ 13; *see NRDC v. EPA*, 507 F.2d 905, 910 (9th Cir. 1974) (a petitioner "will suffer injury if compelled to breathe air less pure than that mandated by the Clean Air Act"). Exposure to increased ozone pollution increases their risk of health complications. Ukeiley Decl. ¶¶ 2, 6; Reinhart Decl. ¶¶ 3, 5; Quayle Decl. ¶¶ 8-12; Ricker Decl. ¶¶ 6, 8-9; Ahlberg Decl. ¶¶ 9-12; *see Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001) ("[E]vidence of a credible threat to the plaintiff's physical well-being from airborne pollutants" establishes injury in fact). Members suffer from health conditions such as asthma and heart disease, and continued ozone pollution will exacerbate them. Reinhart Decl. ¶ 5 (asthma); Quayle Decl. ¶¶ 8-9 (asthma and coronary heart disease as a senior citizen); Ricker Decl. ¶ 8 (congenital heart

issue); *see Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021) (holding "credible allegations of respiratory distress" are injuries in fact).

Members typically enjoy spending time outdoors, but when ozone levels are high, members reduce or forgo time outdoors. Reinhart Decl. ¶¶ 4-7; Quayle Decl. ¶¶ 7, 12-13; Ricker Decl. ¶¶ 7-8; Ahlberg Decl. ¶¶ 13-17; *see Ass'n of Irritated Residents*, 10 F.4th at 943 (holding that "harm to [] recreational" interests "as a result of ozone pollution" suffices to establish injury). Members also enjoy the outdoors less because ozone pollution reduces visibility. Reinhart Decl. ¶ 8; Ukeiley Decl. ¶ 3; Ahlberg Decl. ¶ 7; *see Ass'n of Irritated Residents*, 10 F.4th at 943 (holding that diminished views from ozone pollution are an injury). And because of concerns about the health consequences of ozone exposure, members utilize indoor air purifiers. Bahr Decl. ¶ 18; Quayle Decl. ¶ 13.

Second, members' injuries are fairly traceable to EPA's waiver of stronger pollution control measures that would have reduced ozone-forming emissions—measures that would have been required had EPA downgraded Phoenix to Serious nonattainment and required contingency measures to kick in. Harmful emissions are and will be higher than they otherwise would have been. *E.g.*, Reinhart Decl. ¶¶ 8-9; Ukeiley Decl. ¶ 6; Quayle Decl. ¶ 14; Ahlberg Decl. ¶¶ 19-23.

Finally, a favorable order setting aside EPA's action would redress members' injuries because Arizona would have to implement more stringent control

measures—reducing harmful emissions and members' exposure thereto. Reinhart Decl. ¶ 9; Ukeiley Decl. ¶ 6; Ahlberg Decl. ¶¶ 24-25; Ricker Decl. ¶ 11; *see Laidlaw*, 526 U.S. at 181 (finding redressability where relief would lessen environmental harm).

## STANDARD OF REVIEW

Courts apply the Administrative Procedure Act's standard of review in cases challenging EPA actions under Clean Air Act Section 179B. *Sierra Club v. EPA*, 346 F.3d 955, 961, *opinion amended on denial of reh'g*, 352 F.3d 1186 (9th Cir. 2003); 5 U.S.C. § 706(2)(A). The Court shall "hold unlawful and set aside" EPA's action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Courts review questions of law *de novo*, including statutory interpretation. *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024). When construing statutes, Courts "use every tool at their disposal to determine the best reading." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 373 (2024) (quotation omitted). Those tools include the "longstanding practice of the government," which helps "inform [a court's] determination of what the law is." *Id.* at 386 (quotation omitted). In addition, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).

The Court also must determine whether EPA "articulate[d] a rational connection between the facts found and the choice made." *Sierra Club*, 346 F.3d at 961 (cleaned up). An action is arbitrary and capricious if an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agencies changing course on factual determinations "must supply a reasoned analysis." *Id.* at 57 (quotation omitted).

## SUMMARY OF ARGUMENT

EPA's 179B waiver unlawfully ignores Arizona's failure to implement required pollution control measures, arbitrarily reaches conclusions that do not flow from the facts, and excuses Phoenix from pollution control measures that are required by the Clean Air Act.

First, EPA misreads the statute to find that reducing local pollution as expressly required by the Act is not a prerequisite to a 179B waiver, reversing its prior longstanding reading of the statute. The text, structure, and purpose of the Clean Air Act show that before nonattainment areas can qualify for a 179B waiver, they must implement the Act's required control measures—the heart of the nonattainment program—to reduce local pollution. Implementing these measures is

a prerequisite to a 179B waiver because only *after* Arizona has done what the Act requires it to do to reduce pollution within its control can EPA determine whether international emissions were the but-for cause of nonattainment. Because Arizona failed to implement required local pollution controls, EPA cannot excuse its nonattainment based on international emissions.

Second, EPA's technical analysis is legally and logically flawed, accepting average estimates that ignore seasonal variations in international ozone contributions and cannot establish but-for causation on the days that matter—days with ozone exceedances. That approach is fatally divorced from how ozone nonattainment is determined. Further, EPA's assessment fails to account for countervailing evidence. And the agency improperly discounts data based on wildfire impacts, without following the analysis and procedures for excluding "exceptional events" required by the Act and EPA's own implementing regulations. In addition, EPA does not rationally explain why it departs from its prior guidance, which would have required MAG to present more evidence to support the waiver. Further, EPA's conclusion that the weight of evidence supports the 179B waiver is irreconcilable with EPA's own findings that MAG's evidence was flawed and inconclusive.

Third and finally, not only does EPA unlawfully issue a waiver, but it also illegally waives requirements that lay beyond 179B's scope. When nonattainment

areas like Phoenix miss their statutory deadlines for attaining the standard or making reasonable further progress, the Act requires implementation of contingency measures. These measures automatically kick in as a back-up to reduce pollution when an area either does not attain or fails to reduce ozone precursors by a fixed amount. But EPA discards those requirements for Phoenix, unlawfully expanding 179B's narrow waiver provisions.

For all these reasons, the 179B waiver should be vacated.

## ARGUMENT

### I. EPA's Action Violates the Clean Air Act Because Phoenix Failed to Implement Legally Required Pollution Controls

Instead of reducing local pollution as the Act requires, MAG blames Phoenix's nonattainment on unidentified sources thousands of miles away. But 179B only applies when a state has done all that's required to reduce pollution at home and lacks additional options because international emissions are driving the problem. EPA ignores the statute, its own binding rulemaking, and its longstanding interpretation to grant MAG a waiver despite Phoenix's failure to comply with the Act's required emission reductions. EPA's action permits Phoenix to avoid any additional action to reduce pollution within its control, in contravention of the Clean Air Act.

### A. The Best Reading of the Statute Mandates that Phoenix Must Have Implemented Required Pollution Controls to Qualify for a 179B Waiver

The text of the Clean Air Act, along with the statutory context, structure and purpose, as well as EPA's own regulations and prior interpretations, all show that to qualify for a 179B waiver, MAG must have met its legal obligations to reduce ozone-forming pollution from Phoenix sources by the attainment deadline. Yet EPA granted MAG a 179B waiver even though MAG failed to implement these mandatory pollution-reduction controls—a fact that MAG admits and EPA does not dispute. *Supra* pp. 15-16 (explaining Phoenix failed to implement technology-based controls and to reduce ozone precursors by 15%); 2-ER-040 n.15 (failing to resolve comments on lack of Act-compliant local pollution control).

Courts employ the "full interpretive toolkit" to determine the "best meaning" of statutes. *Loper Bright*, 603 U.S. at 412. Statutory interpretation begins with "the words of a statute," which "must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. United States*, 588 U.S. 128, 140 (2019) (quotation omitted). In addition to "context and structure," courts "often look to 'history' [and] 'purpose' to divine the meaning." *Id.* (quotation omitted). A remedial statute, like the Clean Air Act, "should be construed broadly to effectuate its purposes." *Comm. for a Better Arvin v. EPA*, 185 F.4th 957, 967 (9th Cir. 2026).

As EPA has long recognized, a state cannot show that international emissions are the "but for" cause of a nonattainment area's failure to attain if it starts with a baseline where the state has failed to take all legally required steps designed to achieve attainment. *See* 81 Fed. Reg. at 81304 ("[I]f the air agency did not adopt reasonable control measures before making a section 179B(b) demonstration, it will be missing a critical component of the demonstration."). The sponsor of the amendment to add 179B explained its purpose to Congress before Congress adopted it:

> [I]t will be up to the State, the region, and the city to prove that they are in compliance, based on what they do…they will have an opportunity to come to EPA and say that *they are in compliance in terms of their emissions*, that their failure to meet the overall standards is due to something that is happening in a sovereign foreign country over which they exercise no control.

136 Cong. Rec. S4121 (1990) (statement of Sen. Gramm) (emphasis added). Allowing Phoenix to avoid these controls and still blame nonattainment on international emissions is like excusing a child from cleaning their portion of a shared room because their sibling contributed a bit to the mess. EPA has not acknowledged that its new interpretation would create precisely this type of loophole, eviscerating the Act's core by allowing and even incentivizing nonattainment areas to evade their duty to reduce local pollution. *See* 42 U.S.C. § 7401(c) (Act's "primary" goal is "pollution prevention"). Indeed, under EPA's new interpretation, a state could do absolutely nothing to tackle pollution within its

control—and yet still qualify for a waiver. Courts "tread lightly…in approving any interpretation of the Clean Air Act which might interfere with the statutory goal of ensuring that each state comply with the [national air standards] as 'expeditiously as practicable.'" *Connecticut v. EPA*, 696 F.2d 147, 164 (2d Cir. 1982) (quoting 42 U.S.C. § 7502).

The statute's structure and context demonstrate that Congress expected only fully compliant nonattainment areas to qualify for a 179B(b) waiver. The Clean Air Act sets deadlines for states to submit plans demonstrating that the area will achieve the ozone standard by the attainment date via modeling the air quality improvements from legally required pollution controls. 42 U.S.C. § 7502(b); 40 C.F.R. § 51.1308. The Act expressly requires those controls to include RACM, RACT, ozone precursor reductions, and other measures and imposes deadlines for their implementation. 42 U.S.C. §§ 7502(c), 7511a(b); *see generally* 40 C.F.R. § 51.1312; *supra* pp. 6-7. In this case, MAG had to submit its Moderate SIP and implement RACM and RACT by January 1, 2023, nearly two years before the attainment deadline. 87 Fed. Reg. at 60907. Thus, by the time of its 179B(b) submission, Phoenix must by law have already adopted and implemented all of these required measures.

This commonsense procedure—plan for attainment; implement required pollution controls; and, only if those fail, apply for a retrospective 179B(b)

waiver—is outlined in the statute's text. During the planning phase, Section 179B(a) provides for prospective waivers, allowing EPA to approve SIPs that fail to model attainment due to international emissions. But EPA can grant a prospective waiver only if the SIP "meets all the requirements applicable to it," such as planning for RACM and RACT. 42 U.S.C. §§ 7509(a)(1), 7511a, 7502. Subsection (a) demonstrates that Congress expected the adoption and implementation of required pollution controls well before the area must demonstrate actual attainment based on the actual air monitoring, and therefore well before when the area could even consider submitting a 179B(b) retrospective waiver request. Congress thus assumed, reasonably, that the emission controls Congress itself required in the Act would be in place before a retrospective request would be submitted. *See United States v. Kittson*, 161 F.4th 619, 627 (9th Cir. 2025) (interpreting "statute as a symmetrical and coherent regulatory scheme" and "presum[ing] that Congress is knowledgeable about existing law pertinent to the legislation it enacts" (quotations omitted)).

Departing from its longstanding interpretation, EPA argues that 179B(a)'s express SIP requirements mean that pollution controls are not a prerequisite for 179B(b)'s applicability. 2-ER-041. But the statutory context, structure, and purpose do not "support a sensible inference" that Congress deliberately omitted prerequisite language from 179B(b). *Roe v. Critchfield*, 137 F.4th 912, 930 n.15

(9th Cir. 2025). While 179B(b) does not expressly require that an area meet all SIP requirements, the absence is due to differences between the two subsections and Congress's expectation that states will have already complied with the statutory requirements to adopt pollution controls. Subsection (a) concerns EPA's authority to approve a certain type of SIP, so naturally Congress mentioned what an approvable SIP should contain. In contrast, subsection (b) waives certain requirements related to nonattainment repercussions, and by its very nature, subsection (b) comes into play only years after the statute requires the SIP to have been approved and implemented. SIP requirements therefore "did not merit special mention in the text" of 179B(b). *Id.* Further, Congress intended the exemptions to be limited to the listed provisions—not expanded to subvert preexisting date-certain pollution control requirements. *See Jeldness v. Pearce*, 30 F.3d 1220, 1225 (9th Cir. 1994). EPA's interpretation is also illogical: Congress could not have intended stricter guardrails for the less-consequential prospective waiver than for the more-consequential retrospective waiver. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("[I]t does not, one might say, hide elephants in mouseholes.").

### B. EPA Deviates from Its Binding Rulemaking and Long-Standing Interpretation

EPA's new interpretation not only violates the statute—it also conflicts with its own binding rulemaking. When promulgating the Implementation Rule for the

2015 ozone standard, EPA established that timely implementation of RACT and RACM is a prerequisite for Moderate and higher areas to qualify for a retrospective 179B(b) waiver. 83 Fed. Reg. at 63010. In the final rule, EPA chose not to make RACM and RACT a prerequisite for *Marginal* areas to receive a 179B(b) waiver (because the statute does not require any RACM or RACT for Marginal areas). But the agency "maintain[ed] the approach" that areas classified *Moderate* and higher, like Phoenix, "must show that they have implemented RACM/RACT" for the "purposes of [Clean Air Act] section 179B demonstrations." *Id.*

EPA attempts to dispose of its own reading of the statute because this language appears in the "preamble" of the 2018 Implementation Rule, arguing it does "not have binding effect." 2-ER-032. EPA is wrong.[7] Courts give legal effect to preamble language when it is the agency's "final, unequivocal interpretation," indicating that the agency intended to "bind itself." *Safer Chemicals, Healthy Fams. v. EPA*, 943 F.3d 397, 422 (9th Cir. 2019); *see also NRDC v. EPA*, 571 F.3d 1245, 1252 n.2 (D.C. Cir. 2009) (giving legal effect to preamble language on RACT requirements because EPA's statements were "clear" and "not conjectural").

---

[7] EPA also contradicts itself, relying on language from the same preamble section to justify another position. 2-ER-061-062 & n.38. Such inconsistencies are "the hallmark of arbitrary action." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1145 (9th Cir. 2015) (quotation omitted).

That intent is manifest here. The RACM/RACT prerequisite language is EPA's final, unequivocal interpretation of its regulation, promulgated after notice and comment. The language appears under the heading "Final Rule" explaining EPA's process and conclusion of the RACM/RACT regulation. 83 Fed. Reg. at 63010. In the same paragraph, EPA clarified what the regulation did and did not accomplish. *Id.*

Moreover, EPA's 2018 rulemaking comports with the agency's longstanding interpretation of the Act. In promulgating the 2015 ozone standard, for example, EPA explained that a 179B(b) waiver applies "[i]f a state is unable to demonstrate attainment of the [standard] in such an area impacted by international transport *after* adopting all reasonably available control measures (*e.g.*, RACM, including RACT)." 80 Fed. Reg. at 65444 (emphasis added). This sequence of events "insures that states will take actions to mitigate the public health impacts…by imposing reasonable control measures on the sources that are within the jurisdiction of the state while also authorizing EPA to approve such…[179B] demonstrations even though they do not fully address the public health impacts of international transport." *Id.* EPA reiterated its approach when rejecting a 179B(b) request from the Salt Lake City area: "[S]ection 179B is intended to apply to areas that could not attain the [ozone standard], *even after adopting all feasible emissions control measures and technologies* because of large contributions from

international transport." 7-ER-1139 (emphasis added). The agency's newfound contrary interpretation thus lacks "consistency with earlier and later pronouncements," which counsels against its persuasiveness. *Loper Bright*, 603 U.S. at 370 (quotation omitted).

Finally, at minimum, MAG's failure to implement mandatory emission controls is indisputably an "important aspect of the problem" that EPA has arbitrarily ignored. *State Farm*, 463 U.S. at 43. As EPA has previously recognized, because MAG "did not adopt reasonable control measures before making a section 179B(b) demonstration, it [is] *missing a critical component* of the demonstration that the area would have attained the ozone [standards] by the attainment date 'but for' international impacts." 81 Fed. Reg. at 81304 (emphasis added). EPA cannot rationally assess the but-for cause of Phoenix's nonattainment when the baseline (the current ozone level) is skewed due to Phoenix's failure to perform its statutory duty to reduce local pollution within its control.

## II. EPA Fails to Lawfully or Rationally Show that International Emissions Were the But-For Cause of Phoenix's Ozone Violations

EPA approached its determination with a singular aim in mind: "to work with" entities like MAG "to *develop* the evidence necessary to grant regulatory relief." 7-ER-1106 (emphasis added). In pursuit of this goal, EPA relies on evidence that does not meet the strict statutory "but for" standard, ignores contrary evidence, devalues so-called "atypical data" without complying with the Clean Air

Act's requirements for doing so, discards prior positions without adequate explanation, and issues inconsistent conclusions. These errors render EPA's determination arbitrary and capricious.

### A. EPA Ignores the Statutory But-For Standard and Evidence Contradicting Its Analysis

MAG's "primary line of evidence" stems from its photochemical modeling, which attempts to quantify the impact of international emissions on Phoenix's ozone levels. 90 Fed. Reg. at 52026. But the statutory question is not whether international emissions contributed in general to ozone levels in Phoenix, or how much they contributed on average. The question is whether such emissions were the but-for cause of Phoenix's design value violating the standard, and that design value is based on exceedances of the standard on specific peak ozone days—not average ozone levels. 42 U.S.C. § 7509a(b); 40 C.F.R. Pt. 50, App. U. Neither MAG nor EPA answer, or even attempt to answer, this question. Instead, MAG's approach unreasonably averages away international contributions' demonstrated seasonal variations and ignores the resulting impact on the design value. But Courts do "not defer to any agency decision that 'is without substantial basis in fact.'" *Sierra Club*, 346 F.3d at 961 (quotation omitted). Further, EPA arbitrarily discounts contradictory evidence that demonstrates the flaws in MAG's averaging approach.

### 1. MAG's Averaging Approach Obscures Seasonal Variations and Does Not Comport with the Statutory Standard for Ozone Nonattainment Areas

The extent of international contributions on a given exceedance day depends on numerous factors, such as varying wind patterns and seasonal fluctuations. 3-ER-385. These seasonal trends are illustrated in MAG's photochemical model, which shows that international contributions during spring and early summer "were higher than those for the entire modeling period." 5-ER-666. In particular, international contributions are far lower in July and August compared to May and June. 3-ER-358 fig. 3-2. The contribution from international emissions is lowest in August:




*2023 international ozone contribution (all monitoring sites)*, 3-ER-358 fig. 3-2; *see also* 5-ER-664.

MAG's demonstration obscures these seasonal variations by averaging them away, asserting that the average international contribution to ozone levels ranged from 10 to 14 ppb. 2-ER-283 tbl. 1-1. MAG then simply removes its calculated average international contribution from the 2023 design value for each monitor by applying the "Relative Response Factor." *See* 2-ER-294 tbl. 3-1; *supra* pp. 18-19. That approach, though, is fundamentally divorced from how the Act assesses compliance. Design values are not calculated based on summer-long averages. Instead, at each monitor, regulators must identify the fourth-highest reading during the design year. That process is repeated for the two prior years. 40 C.F.R. §§ 50.19, 51.1300(b); *supra* p. 8. Thus, the critical data points are the four highest readings at each monitor during each ozone season. But MAG's averaging approach fails to examine international contributions on those four specific exceedance days, instead assuming that an average estimate is representative. This is as fallacious as assessing the conditions leading to a traffic jam by relying on the daily averages of vehicles on surrounding roads, rather than considering rush hour.

An example serves to illustrate the incompatibility of MAG's approach with the Clean Air Act's requirements. Say a monitor registers twenty exceedances at 78 ppb, resulting in a design value of 78 ppb, with sixteen of those exceedances each influenced by 10 ppb of international contributions. But, because of different meteorological conditions, the other four exceedances are *not* at all influenced by

international pollution. In that scenario, even considering international pollution, the fourth-highest reading would still exceed the ozone standard at 78 ppb. But the average international contribution across all twenty exceedance days would be 8 ppb.[8] Removing this average from the design value would result in an attaining design value of 70 ppb. By implementing an averaging approach, MAG would incorrectly conclude that the monitor complied with the ozone standard but for international emissions, when in reality it had failed to attain that year even considering international contributions.

The evidence presented by MAG thus does not, and cannot, establish but-for causation: MAG's analysis fundamentally conflicts with the actual ozone standard by applying an averaging approach, when the Clean Air Act requires examining specific high-ozone exceedances. This Court has previously carefully examined whether the evidence presented in a 179B determination was sufficient within the context of the Clean Air Act's specific standard. In *Sierra Club*, 346 F.3d at 962, the Court compared the evidence against the specific design value formula for attainment, and ultimately vacated EPA's determination. *Id.* Similarly, in *National Parks Conservation Association v. EPA*, petitioners argued that the model used could not explain the agency's conclusions, because the situation at hand was

---

8 $\frac{(10\ ppb \times 16\ exceedances) + (0\ ppb \times 4\ exceedances)}{20\ exceedances} = 8\ ppb\ per\ exceedance$

simply "beyond the…model's ability." 788 F.3d at 1146. There, as here, EPA inappropriately applied the model, because its results inherently did not address what "the Act requires." *Id.*

Further, EPA's determination is also arbitrary because it ignores "an important aspect of the problem"—the seasonal variations. *State Farm*, 463 U.S. at 43. As demonstrated, those variations in international contributions can make the difference between attainment and nonattainment, and those variations are pronounced here. *Supra* pp. 38-39. Yet MAG's approach does not take into account seasonal variations. 2-ER-309-310.

MAG's approach suffers from an additional foundational flaw: not only does it average away seasonal variations; it also skews the average by basing it primarily on dates with high international contributions. MAG chose to calculate the average international contribution based only on the top ten *modeled* exceedance days. 2-ER-310. Those modeled exceedance days, though, mostly "occurred during May through June," 2-ER-310 n.40, when international contributions are greater. But numerous exceedance days actually occurred in July and August, *e.g.*, 2-ER-170 tbl. 4, when international contributions are lower. So MAG's proffered "average" is not even, in fact, a true average; it overestimates international contributions. Extending the traffic analogy, MAG's approach is akin to searching for the cause of a morning jam by looking at the average *afternoon*

data, when commuter behavior is completely different. MAG's demonstration is thus based on unrepresentative data, rendering its conclusions and EPA's approval arbitrary. *See Greater Yellowstone Coal. v. Servheen*, 665 F.3d. 1015, 1027 (9th Cir. 2011) (finding agency action "irrational" where the agency based its analysis of grizzly bears on unrepresentative data).

### 2. EPA Discounts Record Evidence That Contradicts MAG's Conclusions

In its quest "to *develop* the evidence necessary" to approve MAG's request, EPA also arbitrarily discounts several pieces of evidence contradicting MAG's conclusions from the photochemical model. 7-ER-1106 (emphasis added); *see Alaska Cmty. Action on Toxics v. EPA*, 180 F.4th 1188, 1199 (9th Cir. 2026) ("[A]n agency must account for evidence in the record that may dispute the agency's findings." (quotation omitted)).

First, commenting on the seasonal variations, Public Interest Petitioners explain that, excluding late-summer international contributions in July through September 2023, there are multiple monitors that would likely still exceed the ozone standard. 2-ER-169-170. Petitioners specifically argue that MAG's approach "obscures variations in [international] contributions at individual monitoring sites that are too low to have caused an exceedance at that site." 2-ER-171. In response to this comment, EPA quibbles with Petitioners' sample calculations. 2-ER-131-

132.[9] But EPA fails to address Petitioners' core concern that MAG's approach does not and cannot account for seasonal variations in international contributions, and Petitioners' sample calculations serve to illustrate the impact of those errors. *See* 2-ER-131-133.

Second, MAG's HYSPLIT model tells a different story. Unlike the photochemical model, the HYSPLIT model examines whether specific exceedance days were influenced by international emissions. 3-ER-377. The HYSPLIT model does not quantify the impact of international emissions, but even operating under the extremely conservative assumption that international contributions were high enough to cause an exceedance on *every* date that could have included *any* emissions from Mexico, the model shows at least one monitoring site with a design value violating the ozone standard, even after removing days influenced by international emissions or wildfires. 3-ER-381 (design value of 71 ppb at Pinnacle Peak monitor).[10] *See Sierra Club*, 346 F.3d at 961-62 (examining wind patterns and

---

[9] EPA argues that the values Petitioners' calculations rely on are "absolute concentrations directly from the output of the model," while MAG "does not use these exact values"—it instead uses a Relative Response Factor, which is an average of international contributions. 2-ER-131. But that is precisely the problem. Nowhere does MAG provide international contributions with respect to specific exceedances, aside from the data that Petitioners relied on for their calculations.

[10] MAG's HYSPLIT analysis also impermissibly excluded so-called "atypical events." *Infra* p. 46. With those dates included, more sites may have violated the ozone standard. *See* 2-ER-161-163 (conducting similar wind analysis and finding multiple sites exceeding the ozone standard when "atypical events" are included).

concluding that specific exceedances of the air quality standard did "not comport with the theory of cross-border transport"); *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 290 (D.C. Cir. 2023) ("The presence of a single violating monitor justifies a nonattainment designation."). This evidence further underscores the importance of looking at specific exceedance days, rather than modeled averages; examining specific dates demonstrates that Phoenix's ozone problem is homegrown.

Third, MAG relies on two EPA-conducted photochemical modeling efforts—but neither of those modeling efforts can reasonably be interpreted to support the 179B demonstration and, in fact, they contradict MAG's photochemical modeling. In its 2021 Modeling Memorandum, EPA estimated an average international contribution of 8.5 ppb between 2018 to 2020. 2-ER-310 (discussing 2021 Modeling Memorandum, 7-ER-1144-1160).[11] This estimate is roughly half of MAG's maximum estimate of 16 ppb, yet EPA blithely asserts that those results are "within the range" of MAG's photochemical modeling results. 2-ER-316. But EPA's estimate produces the opposite outcome as MAG's estimates: even under MAG's fatally-flawed approach to interpreting the modeling results, removing 8.5 ppb from the 2023 design value (80 ppb) yields a non-attaining

[11] In the Memorandum, EPA concluded that only border areas, not areas like Phoenix, face international contributions anywhere comparable to domestic contributions. 7-ER-1152.

design value of 71 ppb. EPA does not explain why it defers to MAG's estimate over its own modeling (the key difference being, of course, that EPA's estimate would not yield attainment). *Contra* 2-ER-102 (incorrectly concluding that the EPA modeling results are "supporting that the area would have attained but-for international emissions").

In the second modeling exercise, EPA estimated that in 2023—the same year that MAG modeled—emissions from northern Mexico contributed only around 3 ppb to Phoenix's ozone levels, yet Phoenix is nearly 10 ppb away from meeting the ozone standard. 3-ER-377. EPA theorizes that "a large portion of the international contributions" come from elsewhere, such as Asia. 2-ER-311. But that theory conflicts with EPA's acknowledgement that MAG's demonstration "focuses on emissions from Mexico," and that "[m]ost observed high days…take place in the summer" when Mexican emissions, not Asian emissions, have the "greater contribution." 2-ER-310. If Mexican emissions have the greater contribution on high exceedance days, and EPA-modeled emissions from northern Mexico accounts for just 3 ppb on those days—when observed exceedances routinely ran more than 10 ppb over the ozone standard[12]—it is beyond implausible to attribute those exceedances to international emissions. Rather than grapple with that conflicting line of evidence, EPA simply ignores its Ozone Transport Rule

[12] *See* 2-ER-170 tbl. 4.

modeling in its conclusions. *See* 2-ER-316-317 (discussing only the 2021 Modeling Memorandum).

### B. EPA Illegally and Improperly Considers MAG's "Atypical Events" Demonstration by Circumventing the Act's Limits Related to "Exceptional Events"

As part of its demonstration, MAG recalculates Phoenix's 2023 design value without international contributions, and also excludes data from thirty-one days that it labeled 'atypical'—a characterization with no statutory or regulatory basis—due to purported wildfire smoke impacts. EPA finds the evidence of wildfire impacts inconclusive but nonetheless ultimately accords it weight, explaining that excluding the data lowers the design value. 2-ER-278; *see also* 2-ER-317 ("[I]t contributes to the weight of evidence.").

But the Clean Air Act and EPA's implementing regulations provide a pathway with strict limitations for excluding smoke-influenced data from design value calculations, with which the demonstration did not comply. That pathway specifically applies for determinations "with respect to exceedances," 42 U.S.C. § 7619(b)(3)(B)(iv), and "with respect to…violations of the national ambient air quality standards," *id.*, including "whether a nonattainment area has attained," 40 C.F.R. § 50.14(a)(1)(i)(C). The present action unquestionably involves exceedances and an assessment of Phoenix's compliance with the ozone standard, yet EPA impermissibly circumvented the required pathway. *See Whitman*, 531 U.S.

at 485 ("EPA may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion."); *NRDC v. Herrington*, 768 F.2d 1355, 1396 (D.C. Cir. 1985) ("[A]n agency may not ignore the decisionmaking procedure Congress specifically mandated.").

The Clean Air Act and EPA's Exceptional Events Rule require states to establish "a clear causal relationship" between the event and measured exceedance. 42 U.S.C. § 7619(b)(3)(B)(ii); 40 C.F.R. § 50.14(c)(3)(iv)(B). Thus, it is insufficient to merely show that smoke contributed to ozone levels; states must show "that emissions from wildfires *caused* a specific air pollution concentration in excess" of the ozone standard "at a particular air quality monitoring location." 40 C.F.R. § 50.14(b)(4) (emphasis added). Other limitations also apply. For example, certain events do not qualify for exclusion, such as events involving high temperatures. 42 U.SC. § 7619(b)(1)(B)(i-iii). Further, the Exceptional Events Rule requires states to conduct robust public engagement, and EPA must issue a formal concurrence before data can be excluded. 40 C.F.R. § 50.14(c)(2)(ii), (c)(3)(i).

MAG did not comply with these requirements. Instead, MAG's demonstration, which never went through a public comment period, includes a list of thirty-one exceedance days to exclude from its design value calculation. 6-ER-843; 2-ER-183. MAG does not even attempt to establish that emissions from wildfires "caused" each exceedance at each monitor, 40 C.F.R. § 50.14(b)(4);

rather, MAG only aims to show that wildfires "impacted air quality," 6-ER-843; *see also* 2-ER-186. Even under this much lower standard, EPA finds that MAG's "evidence is inconclusive." 2-ER-278. And MAG makes no attempt to disprove impermissible factors (such as high temperatures) as potential causes of the exceedances. *See, e.g.*, 6-ER-886 (acknowledging "very warm surface temperatures…aiding ozone formation" but failing to assess impact on exceedance).

Despite these failings, when MAG identifies the fourth-maximum ozone reading at each monitor for each year, it unilaterally excludes the "atypical" data, contravening the Clean Air Act's limitations on excluding wildfire-influenced data "with respect to exceedances." 42 U.S.C. § 7619(b)(3)(B)(iv). MAG then uses the errant design value to support its demonstration regarding Phoenix's violations of the ozone standard in contravention of the Clean Air Act and Exceptional Event Rule's limitations on excluding wildfire days concerning violations and attainment of the ozone standard. *Id.*; 40 C.F.R. § 50.14(a)(1)(i)(C).

MAG argues that it can exclude the data because its design value calculation is not "by itself regulatory [sic] significant," asserting that after excluding atypical events, the design value still exceeds the ozone standard. 3-ER-339. But that distinction is irrelevant: besides the fact that a successful 179B demonstration does have major repercussions, "regulatory significance" is not the applicable standard.

The statute expressly limits the exclusion of data from "determinations by [EPA] with respect to exceedances or violations of the national ambient air quality standards." 42 U.S.C. § 7619(b)(3)(B)(iv); *see Alaska v. Nat'l Marine Fisheries Serv.*, 171 F.4th 1145, 1157 (9th Cir. 2026) ("The plain text of the [statute] provides ample support…."). MAG's adjusted design value calculation relies on identifying exceedances, and EPA's entire determination is aimed at "fulfill[ing] the EPA's statutory obligation to determine whether [Phoenix] attained" or not. 91 Fed. Reg. at 13778. Neither MAG nor EPA identify any applicable statutory or regulatory provision authorizing the exclusion of "atypical" exceedances from a design value calculation through a process other than that outlined in the Act and the Exceptional Events Rule.

Yet EPA nonetheless considers MAG's atypical events information, finding that "it contributes to the weight of evidence." 2-ER-317. By according weight to MAG's extra-statutory atypical events demonstration, EPA's determination arbitrarily relies on "forbidden considerations." *MCI Telecomms. Corp. v. FCC*, 917 F.2d 30, 39 (D.C. Cir. 1990); *see Comm. for a Better Arvin*, 185 F.4th at 964 (invalidating EPA determination where agency relied on extra-statutory feasibility factor); *Siang Ken Wang v. INS*, 413 F.2d 286, 287 (9th Cir. 1969) (vacating agency action where decision was based on four factors, one of which was irrelevant under "the clearly enunciated policy of Congress").

### C. EPA Arbitrarily Changes Its Policy on 179B Demonstrations Without Adequate Explanation Even Though the Facts Justifying the Policy Still Exist

Next, EPA ignores technical factors that it previously considered, without reasoned explanation as to why those factors are no longer relevant. When an agency changes its position based on "factual findings that contradict those which underlay its prior policy," it must "provide a more detailed justification." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687-88 (9th Cir. 2007) ("If an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.").

In 2020, EPA issued guidance explaining certain circumstances where the agency would require a more detailed demonstration, with additional evidence, for a 179B demonstration to succeed. Given the "extensive number of technical factors and meteorological conditions" and the fact that "[m]odel contributions will be imperfect," EPA detailed necessary considerations in its "weight of evidence" approach. 7-ER-1172,1208. That approach is critical because, as EPA continues to acknowledge, no amount of modeling can deliver a "specific numerical contribution," 2-ER-102; more evidence is necessary.

In particular, EPA explained that additional evidence would be necessary when the affected monitors are not located near an international border, or when

the demonstration failed to identify specific international sources of pollution influencing ozone levels. 7-ER-1188-1189. The agency also explained that the weight of evidence is more compelling when international contributions are larger on exceedance days compared to non-exceedance days. 7-ER-1203,1209. EPA derived these factors from its factual findings. For example, EPA found that the greatest international contributions from ozone occur within forty miles of the border. The agency also determined that international influence on ozone levels is "substantially larger in locations with a large industrial source" on the other side of the border. 7-ER-1188-1189.

EPA went on to apply these factors in subsequent actions. *See* 87 Fed. Reg. at 60906; 87 Fed. Reg. 50030, 50033 (Aug. 15, 2022). There, the agency reiterated that "the relationship between certain…exceedances and associated international transport is clearer in some cases than in others," necessitating "a more detailed demonstration with additional evidence" when the enumerated circumstances are present. 87 Fed. Reg. at 50033. Similarly, in rejecting a 179B demonstration from Utah, EPA again explained that it "does not agree with an interpretation of…179B in which one simply subtracts the modeled international contribution from the design value," 7-ER-1140, because a demonstration should "address other considerations" like those discussed in the 2020 Guidance. 7-ER-1130.

Each of these factors cuts against a "but for" finding here. Phoenix and its monitors are not located on an international border, and indeed, this action marks the first time EPA has granted a waiver to a non-border area. Nowhere does MAG identify specific sources of international pollution allegedly impacting Phoenix on specific days. And the demonstration fails to establish that international contributions are materially higher on exceedance days compared to non-exceedance days, which would have indicated that international emissions actually are the but-for cause of nonattainment.

Yet EPA arbitrarily ignores these factors, declaring that "we no longer consider specific characteristics as necessarily suggesting the need for a more detailed demonstration with additional evidence." 90 Fed. Reg. at 52023; 91 Fed. Reg. at 13779. EPA offers only two reasons for its disregard: that the agency has rescinded the guidance, and that the Act does not dictate specific technical analyses. 90 Fed. Reg. at 52023. Neither argument fulfills the agency's obligation to undertake reasoned decision-making when disregarding its prior factual findings.

EPA's first rationale fails because the agency's rescission was wholly unsupported. In 2025, EPA issued a two-page press release asserting that the guidance "made it unnecessarily difficult for states" to blame their pollution on international sources. 7-ER-1106. The press release did not discuss any technical

rationale for rescission. *Fox*, 556 U.S. at 515. Instead, the release demonstrates that EPA's choice to ignore its own methodology was based on a conclusory assertion, not facts or reasoned explanation. *See* 2-ER-084 (arguing that the guidance "placed excessive burden on states" without explaining why the factual conclusions were incorrect); *see also Earth Island Inst. v. Hogarth*, 494 F.3d 757 (9th Cir. 2007) (affirming vacatur of agency action where the agency "was influenced to at least some degree by…policy considerations rather than science alone").

The agency's second rationale similarly falls short. EPA has not explained why its prior factual findings—that the agency's own modeling supported the application of certain factors in its weight-of-evidence determinations—no longer hold water. EPA has thus failed to offer a "reasoned explanation…for disregarding facts and circumstances that underlay" its prior decision to apply the factors described in its guidance. *Fox*, 556 U.S. at 516; *see Earth Island Inst.*, 494 F.3d at 763 ("[N]o deference to agency discretion as to methodology is appropriate when the agency ignores its own…methodology."). As this Court has made clear, an agency's factual findings based on "relevant data" create an obligation for the agency "to offer a 'satisfactory explanation' for its decision in light of the earlier findings." *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010). EPA "cannot avoid its duty to confront these inconsistencies by blinding itself to them." *Id.* But that is exactly what EPA has done here.

### D. EPA Arbitrarily Declares That Countervailing Evidence Supports the Weight of Evidence, Instead of Cutting Against It

In its weight-of-evidence analysis, EPA repeatedly explains that certain lines of evidence are flawed, inconclusive, and do not support a finding of but-for causation. The agency then immediately contradicts itself, arbitrarily concluding that the same pieces of evidence support MAG's 179B demonstration.

This Court routinely finds agency action arbitrary where the agency makes inconsistent and conflicting statements. For example, in *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966-970 (9th Cir. 2015) (en banc), the Court found that an agency's action was arbitrary and capricious because it failed to reconcile its action with prior factual findings. *See also Humane Soc'y*, 626 F.3d at 1049 (faulting agency for factual findings that were "in apparent conflict" with prior factual findings). EPA's action here is even more egregious: it has failed to reconcile its conclusion with factual findings it made within this very same proceeding. *See Earth Island Inst.*, 494 F.3d at 763-64 ("[B]ecause most of the data the government relied upon was inconclusive…the Final Finding was not rationally connected" to the evidence).

In its technical supporting documents, EPA explains that most of MAG's various lines of evidence do not support but-for causation. As to wildfires, EPA determined that "[o]verall," MAG's atypical events "evidence is inconclusive." 2-ER-278; *see* 2-ER-317 ("information did not conclusively establish wildfire

impacts”). Yet EPA inexplicably concludes that the very same evidence “support[s]” MAG’s 179B request. 2-ER-278; *see also* 2-ER-317. This “inconsistency in EPA’s” determination is “‘the hallmark of arbitrary action.’” *Nat’l Parks*, 788 F.3d at 1145 (quotation omitted).

EPA also identifies, and then dismisses, three fatal flaws in MAG’s HYSPLIT analysis. First, EPA notes that MAG’s analysis shows a design value of 71 ppb after excluding all possible Mexican transport days *and* all so-called atypical events—in other words, the analysis shows nonattainment, even under MAG’s erroneous, best-case scenario. 2-ER-298; *see also* 3-ER-381. Second, EPA faults the HYSPLIT analysis for over-excluding ozone data from days with alleged pollution transport from Mexico, because the days could have included emissions from within the United States. 2-ER-312 (explaining that “the influence of this [Mexican] transport is likely overstated” and that MAG’s “removal of 84% of days due to the presence of any trajectory over Mexico…is likely removing too many days”). Third, EPA finds that “there is not enough information” to support MAG’s claim that all northern and western trajectories were indicative of Canadian and Asian emissions, rather than U.S. emissions. *Id.* But the agency inexplicably contradicts itself, ultimately concluding that the overall 179B demonstration was “*supported* by [the] HYSPLIT trajectory analysis.” 2-ER-317 (emphasis added).

Finally, MAG also presents an analysis of precursor emissions, attempting to pin ozone exceedances on an increase in Mexican precursor emissions. EPA disagrees, explaining that "[i]t is difficult to conclude that an increase in Mexican emissions contributed to exceedances in the nonattainment area." 2-ER-311. At most, MAG establishes only "a possibility of emissions from Mexico affecting the nonattainment area." *Id.* Similarly, MAG seeks to skirt responsibility by reporting a decline in local emissions based on calculated estimates. *Id.* But EPA highlights contradictory measurement-based evidence: "satellite data did not show consistent decrease" in emissions. 2-ER-308. EPA therefore explains that "there is not enough information" from the precursor analysis "to determine the influence of emissions from Mexico." 2-ER-311. Despite that finding, EPA later concludes that the 179B demonstration was "further supported" by the precursor trends analysis. 2-ER-317. Again, EPA offers superficial conclusions on top of incompatible findings.

In response to comments on these flaws, EPA attempts to shift the focus away from each inconsistency by pointing to other lines of evidence for support, arguing, for example, that each issue is just "one piece of evidence provided in the larger weight of evidence of the demonstration." 2-ER-096. But EPA misses the point. Having chosen to apply a weight-of-evidence approach, EPA must rationally determine on which side of the scales each piece of evidence belongs. After determining that a piece of evidence is inconclusive, it is fundamentally irrational

to decide that it supports MAG's conclusions. In doing so, EPA places multiple thumbs on the scale. Other lines of evidence cannot rectify the distortions that the agency created.

*　　*　　*

To reach its desired goal of issuing Phoenix a 179B waiver, EPA ignores the ozone standard's form, waves away evidence without reasoned explanation; considers an improper factor by circumventing the legal process concerning wildfire-impacted data; ignores its own guidance, including prior technical findings; and makes inconsistent, irrational conclusions. That approach is wholly arbitrary.

## III. EPA Unlawfully Excuses Adoption and Implementation of Contingency Measures

In addition to illegally granting Phoenix a 179B waiver, EPA's final action also unlawfully excuses Phoenix from the Clean Air Act's requirement to adopt and implement contingency measures. 91 Fed. Reg. at 13780. The Clean Air Act requires nonattainment areas to include contingency measures in their SIPs to be triggered by specific circumstances, and 179B does not alter those requirements. Contingency measures are a "backup" pollution-reduction tool, ensuring progress

if emission controls like RACM and RACT prove insufficient.[13] *Comm. for a Better Arvin*, 185 F.4th at 961, 966-67. For Moderate areas like Phoenix, there are two triggers: the Act requires contingency measures if the area either (1) "fails…to attain the national primary ambient air quality standard by the attainment date," or (2) "fails to make reasonable further progress." 42 U.S.C. § 7502(c)(9). Contingency measures "automatically take effect when the contingency occurs." *Bahr v. EPA*, 836 F.3d 1218, 1236 n.11 (9th Cir. 2016). Here, despite Phoenix triggering contingency measures on both fronts, EPA unlawfully excuses Arizona from adopting and implementing contingency measures. The agency tries to have it both ways—allowing Phoenix to avoid a classification downgrade despite its failure to attain, while also avoiding the distinct remedial measures that Congress required when progress and attainment are not achieved. This interpretation conflicts with the plain text and best reading of the statute.

### A. 179B Does Not Displace the Failure-to-Attain Trigger for Contingency Measures

EPA erroneously argues that no failure-to-timely-attain contingency measure trigger has occurred, or could ever occur, because 179B somehow rids the agency of its obligation to determine whether the area failed to timely attain the standard.

[13] For example, one of MAG's proposed contingency measures would reduce VOCs by about one ton per day during the ozone season by regulating architectural coatings (like paints, stains, and sealants). SIP Submittal at 29-31.

90 Fed. Reg. at 52029; *see* 2-ER-074. But this reading defies the plain text of the Clean Air Act.

Contingency measures are triggered when the area "fails to…attain" the ozone standard "by the attainment date." 42 U.S.C. § 7502(c)(9). That condition has plainly been met here, as an area's failure to timely attain is the starting point of 179B(b)'s application. Indeed, EPA explicitly determined that "the Phoenix-Mesa area did not attain." 91 Fed. Reg. at 13778; *see* 2-ER-074 ("[T]o be clear, the area has not attained the 2015 ozone [standard]."); 91 Fed. Reg. at 13778 (Final Rule "fulfills the EPA's statutory obligation…to determine whether the Phoenix area attained" the ozone standard).

Furthermore, Section 179B's text does not reference, much less waive, the contingency measures requirement. *See* 42 U.S.C. § 7509a. Because 179B and the regulation "list[] specific exemptions, other exemptions are not to be judicially implied." *Jeldness*, 30 F.3d at 1225; *see Sierra Club v. EPA*, 294 F.3d 155, 160 (D.C. Cir. 2002) ("We cannot but infer from the presence of these specific exemptions that the absence of any other exemption…was deliberate." (citing 179B)). EPA's implementing regulations likewise allow suspension of contingency measures in only one circumstance—when EPA determines that an area did, in fact, attain. 40 C.F.R. § 51.1318.

Section 179B does waive Section 181(b)(2), concerning EPA's duty to reclassify areas based on a determination that the area failed to attain. EPA attempts to shoehorn contingency measures into that provision, arguing that it waives EPA's responsibility to make a "finding of failure to attain" under Section 181(b)(2), and without such a finding, failure-to-attain contingency measures can never be triggered. 90 Fed. Reg. at 52029; *see* 2-ER-074. But Section 181(b)(2) concerns reclassifications based on a nonattainment finding; it says nothing about contingency measures. 42 U.S.C. § 7511(b)(2); *supra* p. 10. The Act does not tie contingency measures to EPA's finding under Section 181(b)(2) of a failure to attain. Instead, contingency measures—unlike reclassifications—are triggered automatically. *Bahr*, 836 F.3d at 1236 n.11.

Section 179B's preservation of contingency measures is consistent with the purpose of those measures, as well as the Act's overarching remedial purpose. This Court has explained that the role of contingency measures is an emissions-reducing "'backup' in case existing measures fall short," serving the Act's purpose "of effective regulation and public health." *Comm. for a Better Arvin*, 185 F.4th at 961, 967. Indeed, contingency measures are all the more important in the context of a 179B(b) waiver, because affected areas have unsafe air quality but escape reclassification and accompanying stricter control measures. And as EPA previously recognized, nothing in 179B alters the Act's purpose of addressing

"sources that are within the jurisdiction of the state regardless of impacts from…international emissions." 81 Fed. Reg. at 81304.

Further, EPA's action here conflicts with its prior interpretations of 179B. In promulgating the 2015 ozone standard, EPA explained that 179B does not "relax[]…mandatory emissions control measures (including contingency measures)." 80 Fed. Reg. at 65444. EPA later reiterated that interpretation. 81 Fed. Reg. at 81304. EPA's attempt to waive contingency measures for Phoenix thus conflicts with both the plain text of the Clean Air Act and the agency's own interpretations implementing the ozone standard at issue.

### B. Phoenix's Failure to Achieve Reasonable Further Progress Independently Triggers Contingency Measures

Phoenix has also triggered the other contingency enumerated in the Clean Air Act: the area has "fail[ed] to make reasonable further progress." 42 U.S.C. § 7502(c)(9). Reasonable further progress here requires MAG to reduce ozone-precursor emissions by 15% from 2017 to 2023. *Supra* p. 6. Phoenix failed to do so. *See* 2-ER-074; *supra* p. 16. That failure automatically triggers contingency measures. *See Bahr*, 836 F.3d at 1236 n.11.

EPA argues that this trigger simply does not exist for Moderate nonattainment areas like Phoenix, reasoning that such areas can trigger the contingency measures requirement "only by a finding that the area has failed to attain the [standard]." 90 Fed. Reg. at 52021. EPA is incorrect. The statute

unambiguously establishes that the reasonable-further-progress trigger is separate and independent of the failure-to-attain trigger.

Starting with the text, the Act requires nonattainment areas to provide for contingency measures "to be undertaken if the area fails to make reasonable further progress, *or* to attain the national primary ambient air quality standard by the attainment date." 42 U.S.C. § 7502(c)(9) (emphasis added). The text uses a comma and the disjunctive "or" to separate the two triggers, indicating that each trigger is an independent event capable of bringing about contingency measures. *United States v. Nishiie*, 996 F.3d 1013, 1023 (9th Cir. 2021). Indeed, the Ninth Circuit reads this provision as providing two triggers. *See, e.g.*, *Comm. for a Better Arvin*, 185 F.4th at 961; *Ass'n of Irritated Residents*, 10 F.4th at 942. And this reading comports with the Act's structure, because attainment and reasonable further progress are two separate requirements with different purposes, as EPA admits. 2-ER-073 ("[Reasonable further progress] is clearly not a 'plan or revision to demonstrate attainment.'" (quoting 179B)).

Grasping for support, EPA points to unrelated provisions governing reasonable further progress for Serious and higher areas. 90 Fed. Reg. at 52021. But nothing in those provisions rids Moderate areas of contingency measures upon their failure to make reasonable further progress. *See* 42 U.S.C. § 7511a(c)(9), (g). Indeed, EPA contradicts itself: the agency acknowledges that, as a Moderate area,

Arizona must provide for and make reasonable further progress in Phoenix even after receiving a 179B waiver. 2-ER-072-075. If Arizona must still provide for reasonable further progress, the area can therefore fail to meet that requirement, and contingency measures continue to have a purpose. *See Ass'n of Irritated Residents*, 10 F.4th at 947 ("The agency may not avoid the need for robust contingency measures by assuming that they will not be needed.").

Finally, EPA's new approach also departs from its longstanding interpretation that a failure to achieve reasonable further progress triggers contingency measures for Moderate areas. *See Loper Bright*, 603 U.S. at 370. In 1992, just two years after Congress adopted the Clean Air Act provisions at issue, EPA explained that "[o]zone areas classified as [M]oderate or above must include…contingency measures to be implemented if [reasonable further progress] is not achieved *or* if the standard is not attained." 57 Fed. Reg. 13498, 13511 (Apr. 16, 1992) (emphasis added).

In sum, because 179B does not waive mandatory contingency measures and both triggering events occurred, EPA unlawfully excuses Arizona from adopting or implementing contingency measures after issuing the 179B waiver.

## IV. Vacatur Is the Appropriate Remedy

EPA's decision should be vacated. The "traditional remedy" for unlawful agency decisions is vacatur. *Comm. for a Better Arvin*, 185 F.4th at 968 (quotation

omitted). Indeed, this Court routinely vacates unlawful EPA Clean Air Act decisions. *E.g.*, *Sierra Club*, 346 F.3d at 963 (179B waiver); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007); *Ober v. EPA*, 84 F.3d 304, 306 (9th Cir. 1996).

Further, the Court should remand with instructions for EPA to reclassify Phoenix as a Serious nonattainment area, as this Court did in *Sierra Club*, 346 F.3d at 963. As there, "the record here has been fully developed, and the conclusions that must follow from it are clear." *Id.* MAG cannot establish but-for causation because it never complied with the requisite local emission controls and because its averaging approach inherently fails to establish whether specific exceedances, and therefore the ultimate design value violations, were caused by international emissions.

EPA's legal error regarding contingency measures also cannot be remedied on remand. Administrative proceedings thus would not "serve a useful purpose." *Id.* And until Phoenix is reclassified, the area is excused from reducing harmful pollution by implementing the more stringent Serious area pollution controls. Phoenix is now years behind schedule in achieving the emission reductions mandated by the Act to protect people's health. Further delay will only prolong Phoenix residents' exposure to dangerously polluted air, thwarting the Act's timetables for cleaning it up. Vacatur and remand with instructions is therefore

necessary to reduce disruptive health and welfare consequences. *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (crafting remedy to avoid "more potential environmental harm").

## CONCLUSION

For the reasons stated above, the Court should hold unlawful EPA's 179B waiver for Phoenix and vacate it as contrary to law and arbitrary and capricious.

Dated October 9, 2026.

*/s/ Alexandra O. Schluntz*
Alexandra O. Schluntz
Ameya Gehi
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
(303) 996-9612
aschluntz@earthjustice.org
agehi@earthjustice.org

David Baron
Earthjustice
1250 I Street NW, Fourth Floor
Washington, DC 20005
(202) 745-5203
dbaron@earthjustice.org

*/s/ Patrick Woolsey*
Patrick Woolsey
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5757
patrick.woolsey@sierraclub.org

*Counsel for Petitioner Sierra Club*

*/s/ Abirami Vijayan*
Abirami Vijayan
Meredith Hankins
Natural Resources Defense Council
1152 15th Street, NW #300
Washington, DC 20005
(202) 836-9866
avijayan@nrdc.org
mhankins@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

*/s/ Ryan Maher*
Ryan Maher
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
(781) 325-6303
rmaher@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-3330

I am the attorney or self-represented party.

**This brief contains** 14,000 **words,** including 22 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ____.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Alexandra O. Schluntz **Date** October 9, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

# ATTACHMENT 1

## Sandra Bahr Declaration

**DECLARATION OF SANDRA BAHR**

I, Sandra Bahr, hereby declare as follows:

1. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.
2. I am a member of the Sierra Club and I have been for 34 years. For the last 28 years, I've worked as the Chapter Director for the Grand Canyon Chapter of the Sierra Club. At various times in the past, I've held other volunteer positions in Sierra Club, including as Chapter Chair and Political Chair for the Grand Canyon Chapter, and served on Sierra Club's National Political Committee and National Conservation Committee.
3. I live in Central Phoenix, Arizona, in Maricopa County. I've lived at my current address for 26 years, and in the area for more than 38 years.
4. The Sierra Club Grand Canyon Chapter's offices are located in Central Phoenix.
5. As of the end of August, 2026, Sierra Club had over 12,200 active members in Arizona.
6. Sierra Club is a non-profit, membership-based organization dedicated to the protection of the environment and public health. Among other issues, Sierra Club works to eliminate or reduce emissions of harmful air pollution, including ozone-forming pollutants.
7. I have been working on ozone pollution issues as long as I've been with Sierra Club. For example, in the 1990s the then-governor of Arizona appointed me to serve on a state-level ozone task force.
8. I'm aware that the Phoenix-Mesa area has been designated as a nonattainment area that does not meet the 2015 National Ambient Air Quality Standard (NAAQS) for ozone.
9. Sierra Club has long advocated to reduce air pollution in the Phoenix area via regulation of emissions from power plants, industrial facilities, and vehicles. Sierra Club advocates for stricter limits on emissions of ozone-forming pollutants such as nitrogen oxides

(NOx) and volatile organic compounds (VOCs) as well as other air pollutants in proceedings at the U.S. Environmental Protection Agency (EPA), Arizona Department of Environmental Quality (ADEQ), and Maricopa County Air Quality Department.

10. In 2019, Sierra Club submitted comments to EPA regarding its proposal to partially approve and partially disapprove the Maricopa Association of Governments' 2017 8-Hour Ozone Moderate Area Plan.

11. In 2022, Sierra Club submitted comments to EPA regarding proposed revisions to Arizona's State Implementation Plan to address interstate ozone transport requirements under the 2015 ozone NAAQS.

12. Sierra Club regularly submits comments to Maricopa County regarding air permitting processes for power plants in the Phoenix area. Sierra Club is also engaged in advocacy with the goal of strengthening Arizona's regional haze State Implementation Plan.

13. From my work, I am aware of the harmful impacts that ozone has on people and the environment. For example, I am aware of research showing that air pollution, including ozone, harms vegetation, decreases lung functions, and contributes to premature death.

14. I often spend time outside in the Phoenix area, both for work and for my own enjoyment. On my own time, I enjoy seeing wildlife, observing petroglyphs, and learning about the place we live and the people who have lived here. I enjoy hiking in South Mountain Park and Rio Salado, and in wilderness areas in the West Valley, like the North Maricopa Wilderness and the Eagletail Mountain Wilderness. I also visit Oak Flat, Picket Post Mountain, and other areas in the Tonto National Forest just east of Phoenix, as well as the Lost Dutchman State Park. I enjoy these areas in particular for their cultural sites and plants and animals, and for their natural beauty.

15. I spend time outside near my home in Phoenix. I enjoy walking outside to meetings or events, at least once a week. I also ride my bike around the neighborhood daily.

16. At my home, I grow tomatoes, peppers, and other vegetables in my yard and spend time outside tending to the garden, and frequently do other types of outdoor yardwork.

17. I have personally experienced poor air quality while spending time outdoors in the Phoenix area, and I can often see smog or haze in the skies. On some days, the smog reduces visibility so that I cannot see mountains that are visible on clear days.

18. We use air purifiers in the Grand Canyon Chapter's offices in Phoenix because of concerns about the health effects of air pollution.

19. I pay attention to the ozone levels in the Phoenix area, and I monitor the "Ozone High Pollution Advisory" email alerts that are sent out by the Maricopa County Air Quality Department and ADEQ.

20. On days when ozone levels are high, I try to reduce the time I spend outdoors and stay indoors more of the time. I know ozone pollution is typically higher in the summer, so I try to limit outdoor activities then.

21. I ride my bike in the morning when air quality is usually better. Sometimes, when ozone levels are high, I avoid walking or biking.

22. I am concerned about the impacts of ozone pollution on my health and on the natural places I enjoy. Based on my knowledge about the harmful effects of ozone on people's health, I am concerned that the air pollution in Phoenix, including ozone pollution, is taking years off my lifespan.

23. I am also concerned about the impacts of ozone pollution on the health of Sierra Club members who participate in outdoor activities, including activities organized by the Grand Canyon Chapter.

24. Many Sierra Club members in the Phoenix area regularly engage in outdoor recreation in the area. Some of those members are more vulnerable to the effects of air pollution because of their age or health conditions.

25. Sierra Club has organized a Martin Luther King Jr. Day of Service in the Rio Salado Habitat Restoration Area annually from 2015-2020 and 2022-2026, which is attended by many Sierra Club members, as well as monthly clean ups and weed removal in the area since 2010.

26. Higher levels of ozone pollution in the Phoenix area would negatively impact me and other Sierra Club members who live in the Phoenix area and spend time outdoors there. If ozone pollution in the area were to become worse, I would reduce the amount of time I spend outdoors and would consider installing air purifiers in my home.

27. Lower levels of ozone pollution in the Phoenix area would benefit me and other Sierra Club members who live in the area. I would be able to spend more time outdoors and worry less about my health and the health of the outdoor places I enjoy.

28. I am aware that local air pollution sources within Arizona, including large industrial facilities and tailpipe emissions from vehicles, contribute to ozone pollution in the Phoenix area. I am concerned that if air pollution from those Arizona sources is not reduced, ozone pollution in the Phoenix area will not get better and may get worse.

29. I am in favor of implementing the strongest possible air pollution controls to reduce ozone-causing pollution originating from sources in Arizona, including pollution from local sources in the Phoenix area like industrial facilities and vehicles.

30. I am aware that in 2026, EPA decided to accept a demonstration under Section 179B of the Clean Air Act purporting to show that ozone nonattainment in the Phoenix area is partly attributable to international emissions sources, and that as a result, EPA concluded that the Phoenix area need not be reclassified from a "moderate" to a "serious" ozone nonattainment area and that Maricopa County need not adopt stricter measures to limit local sources of ozone pollution.

31. I am aware that Sierra Club and other environmental organizations have filed a lawsuit challenging EPA's decision, and that this lawsuit seeks to ensure the adoption of stricter measures to limit local sources of ozone pollution in the Phoenix area. I fully support this litigation to ensure that stronger ozone pollution standards are implemented.

32. If a court vacates EPA's decision regarding the Section 179B demonstration, I understand that stricter ozone pollution limits would likely be required in the Phoenix area. These stricter limits on local ozone pollution would benefit me and other Sierra Club members who live in the Phoenix area.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed in Phoenix, AZ on September 30th, 2026.

Sandra Bahr

# ATTACHMENT 2

## Kenneth J. Ahlberg Declaration

# DECLARATION OF KENNETH J. AHLBERG

I, Kenneth J. Ahlberg, hereby declare as follows:

1. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.
2. I am a member of the Sierra Club. I have been a Sierra Club member for about 17 years.
3. I live in Mesa, Arizona with my wife, Judy. We have lived here since we retired in 2009.
4. I joined the Sierra Club because I am concerned about the impacts that humans are having on the environment, including air pollution and its health effects.
5. Since joining the Sierra Club, I have been involved with various efforts to improve local air quality. For example, I have gone with other Sierra Club members to lobby Arizona state legislators to adopt measures to address air pollution in the Phoenix area.
6. I'm aware that the Phoenix-Mesa area has been designated as a nonattainment area that does not meet the 2015 National Ambient Air Quality Standard for ozone.
7. I frequently see visible smog or haze in the skies in the Phoenix area.
8. Our home in Mesa is located near a large interchange between two major highways, and I worry about the impact of vehicle emissions on the air quality in our neighborhood.
9. I am aware that ozone pollution has harmful impacts on people's health and on the environment, and I am very concerned about those impacts.
10. I am 83 years old. I understand that adults over age 65 are especially vulnerable to the health effects of ozone pollution.
11. When I was about 20 years old, I was hospitalized for three months for histoplasmosis, a type of respiratory infection. Since then, I have continued to experience respiratory symptoms, which are more difficult to manage when the air quality is bad. My wife Judy was diagnosed with asthma and has allergies which cause respiratory symptoms.

12. Poor air quality exacerbates both of our respiratory issues. When the air quality is bad, I find it more difficult to breathe and often have to cut short physical activities.
13. We moved here to Mesa because of the area's natural beauty. We try to get outside as much as possible to get exercise and stay healthy. We enjoy hiking, biking, and birding. We love visiting the local botanical gardens and other local parks to do these activities. We know that getting regular physical exercise is important for maintaining our health.
14. Unfortunately, air pollution regularly prevents us from participating in outdoor activities. When I exercise outside on days with poor air quality, breathing is noticeably more difficult. Just recently, I had to cut an evening hike short because I began coughing and having difficulty breathing. This happens to me at least a few times per month.
15. I monitor news coverage of air pollution levels in the Mesa area, including weather reports and news alerts about days with high ozone levels. When air pollution is high, we avoid spending time outdoors and stay indoors more of the time to limit our exposure. We often cancel plans to go outside multiple times per month due to poor air quality.
16. I am concerned about the impacts of ozone pollution on my and my wife's health. We also worry about the health impacts on other people in our community, in particular the elderly and school-aged children with asthma and other immune system and respiratory disorders.
17. We have considered moving away from Mesa and the Phoenix area in part because of the poor air quality here. We have considered moving out of Arizona to another state with less air pollution, where we can be more active outdoors without risking our health.
18. After experiencing the frequent poor air quality here, we would no longer recommend moving here to friends and family.

19. Higher levels of ozone pollution in the Phoenix area would negatively impact me, because worsened air pollution would exacerbate my respiratory symptoms and require me to reduce the time I spend outdoors.

20. Lower levels of ozone pollution in the Phoenix area would benefit me, because I would be able to spend more time outdoors and worry less about my health.

21. I am aware that local air pollution sources within Arizona, including large industrial facilities and tailpipe emissions from vehicles, contribute to ozone pollution in the Phoenix area. I am concerned that if air pollution from those Arizona sources is not reduced, ozone pollution in the Phoenix area will not get better and may get worse.

22. I am in favor of implementing the strongest possible air pollution controls to reduce ozone-causing pollution originating from sources in Arizona, including pollution from local sources in the Phoenix area like industrial facilities and vehicles.

23. I am aware that in 2026, EPA decided that the Phoenix area would not be reclassified from a "moderate" to a "serious" ozone nonattainment area and that the Phoenix area therefore need not adopt stricter measures to limit local sources of ozone pollution.

24. I am aware that Sierra Club and other environmental organizations have filed a lawsuit challenging EPA's decision, and that this lawsuit seeks to ensure the adoption of stricter measures to limit local sources of ozone pollution in the Phoenix area. I support Sierra Club's litigation to ensure that stronger ozone pollution standards are implemented.

25. If a court overturns EPA's decision, I understand that stricter ozone pollution limits would likely be required in the Phoenix area. These stricter limits on local ozone pollution would benefit me by reducing my exposure to harmful air pollution.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed in Mesa, Arizona on September 29.00, 2026.

Signed by:

2B63A438C9244A3...

Kenneth J. Ahlberg

# ATTACHMENT 3

## Jonathan Evans Declaration

**DECLARATION OF JONATHAN EVANS**

I, Jonathan Evans, declare that the following statements are true and correct to the best of my knowledge, information, and belief, and are based on my personal experiences and my review of publicly available information:

1. I am the Legal Director of the Environmental Health Program and a senior attorney at the Center for Biological Diversity ("the Center"). I am also a member of the Center.

2. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through science, policy, and law. Based on the understanding that the health and vigor of human societies and the natural environment are closely linked, the Center works to protect natural resources like air in order to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for the people that interact with, depend on, and cherish these natural resources. The Environmental Health Program is focused on protecting biodiversity and human health from toxic substances.

3. The Center is a Section 501(c)(3) membership organization. The Center has over 750 members in the Phoenix-Mesa nonattainment area.

4. In my role at the Center, I am involved in strategic decision making and setting policy priorities for the work that the Center does to reduce the threats to the environment and public health from toxic substances, including air pollution, and ozone pollution in particular.

5. The Center's Environmental Health Program works to reduce the threats posed by air pollution through scientific, legal, and policy mechanisms. I, as well as the Program,

strive to represent the interests of our members in areas affected and am concerned about how the negative air quality is impacting them, their families, and the environment that they enjoy.

6. The Center has consistently worked, for over a decade, to reduce ozone pollution in nonattainment areas all across the country, including in the Phoenix-Mesa nonattainment area.

7. Combating air pollution is an issue that is very important to me and the Environmental Health Program because we understand the health impacts of air pollutants, as well as the types and degree of harms from air pollutants to native wildlife and the ecosystems on which they depend. The Program is especially concerned with the effects that air pollutants, including ozone, volatile organic compounds, and nitrogen oxides, have on the environment and human health. I am aware of studies linking these air pollutants to a range of health impacts, such as respiratory problems, increased incidences of hospitalization, and premature mortality.

8. I am aware that air pollution can negatively affect the health and persistence of the wildlife and plant life that I and the Center's other members appreciate observing, studying, photographing, and recreating among in the outdoors. I am further aware that air pollution like ozone can lead to smog and negatively affect my and the Center's other members' experiences in nature and the outdoors. They can additionally lead to broader ecosystem effects by affecting water quality and nutrient cycles.

9. I am aware that EPA approved the 179B demonstration for the Phoenix-Mesa nonattainment area, in contravention of the Clean Air Act, and as a result did not

reclassify the area. This results in excess and illegal air pollution, harming our members collectively and hindering the work the Center does to protect the environment.

10. I support the Center's lawsuit.

11. Neither the claims asserted nor the relief requested in this lawsuit require the consideration of individual circumstances of any aggrieved member of the Center, given that the petition hinges on whether EPA complied with its statutory obligations, and the relief sought is invalidating the agency action. Accordingly, the participation of individual members is not required in this lawsuit.

12. The Center's mission of protecting human health and the environment will be advanced if the Court remands EPA's final action allowing excess, illegal ozone pollution.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 10, 2026.

Jonathan Evans

Jonathan Evans

# ATTACHMENT 4

## Mary K. Reinhart Declaration

**DECLARATION OF MARY K. REINHART**

I, Mary K. Reinhart, declare that the following statements are true and correct to the best of my knowledge, information, and belief, and are based on my personal experiences and my review of publicly available information:

1. I am a member of the Center for Biological Diversity. I have lived in Scottsdale, Arizona, for 29 years, within the area that is not meeting ozone air quality standards.

2. I am employed as a media specialist for the Center for Biological Diversity. I was previously a journalist for the Tribune Newspapers, the Arizona Daily Star and the Arizona Republic, and served as the Director of Communications for the Behavioral Health Administration for Mercy Care, formerly known as Mercy Maricopa Integrated Care. As a reporter and editor in Arizona for 25 years, I focused on the intersection of public health and welfare, policy, and the state legislative agenda. I also helped launch an online news organization—the Arizona Guardian, which centered on issues involving the Arizona Legislature, social welfare, and public health.

3. The dangerous levels of ozone pollution that plague the Phoenix area harm my personal and professional interests. It has been a long-running public health crisis for Phoenix and more work must be done to bring the pollution levels in line with the national standard. Through my work at the Center and past professional experience, I am aware of the serious health harms that acute and chronic exposure to ozone pollution can impose on the human body. Those impacts are particularly threatening to me because I spend a significant amount of time outdoors being physically active.

4. I run about five miles a day, five days a week, and have done so for the last 10 years. Most of my running occurs around my neighborhood, which is in a suburban area. My

home and neighborhood are within the Phoenix ozone nonattainment area. I like to go running in the evenings as the sun goes down and that often coincides with peak commuter traffic.

5. About six years ago I was diagnosed with exercise-induced asthma. I was prescribed an inhaler to use as needed before I run or participate in strenuous outdoor activities. The threat of continuing and worsening ozone pollution in the Phoenix area makes me concerned that I will be unduly limited in my ability to continue to participate and engage in these outdoor activities, which have been deeply beneficial to my mental and physical well-being. I also must avoid exercising on poor air quality days.

6. I also enjoy hiking with my husband and friends in Maricopa County. The Phoenix area offers an array of top-rated hiking trails that provide breathtaking views of the Sonoran Desert.

7. A few of my favorite hiking spots in the Valley are Phoenix Mountains Preserve, McDowell Mountains, Papago Park, Superstition Mountains, and the Spur Cross Ranch Conservation Area. I visit these and other locations about once a month. These spectacular hiking trails are full of wildlife and desert plants, from wildflowers in spring to cactus blooms in summer. It is not uncommon to see coyotes, jackrabbits, lizards, Gila woodpeckers, cactus wrens, hummingbirds, roadrunners, and other wildlife, particularly in riparian areas, at dawn or dusk, and after summer monsoons. I plan to continue to visit and enjoy these locations and engage in these activities for as long as I am physically capable.

8. I understand that species can be harmed by ozone pollution, and that ozone pollution can cause haze that harms my views of wildlife and the beautiful Sonoran Desert. Requiring EPA to reverse its approval of the 179B demonstration for the Phoenix nonattainment area, and to downgrade the Phoenix-Mesa area to the next level of nonattainment, will ensure

Maricopa County takes the steps necessary to lawfully reduce ozone pollution levels in the area to safer levels.

9. I am also deeply concerned about the youth and elderly that reside in Phoenix. I know that this demographic is most susceptible to the detrimental effects of the Valley's unhealthy air quality due to ozone pollution. My children are now young adults, but if I were a parent of young children today, I would be extremely concerned about their wellbeing and quality of life due to the poor air quality in Phoenix and the surrounding areas of Pinal and Maricopa Counties. It is imperative that the EPA follow federal law to ensure that my community receives full protection under the Clean Air Act and becomes a healthier and safer environment with respect to air quality.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 10, 2026

*s/ Mary K. Reinhart*
Mary K. Reinhart

# ATTACHMENT 5

## Robert Ukeiley Declaration

**DECLARATION OF ROBERT UKEILEY**

I, Robert Ukeiley, declare that the following statements are true and correct to the best of my knowledge, information, and belief, and are based on my personal experiences and my review of publicly available information:

1. I have been a member of the Center for Biological Diversity ("the Center") since 2017. I was an attorney with the Center until October 2023 when I retired. I have worked as an environmental attorney, particularly on issues relating to air pollution, for over 27 years.

2. Combatting air pollution is an issue that is very important to me because I understand the health impacts of air pollutants on me, my family, and the Center's other members, as well as species and the environment. I am deeply troubled by the effects that air pollutants, including ozone, have on the environment and human health. I am aware of studies linking air pollution, including ozone pollution, to a range of health impacts, such as respiratory problems, increased incidences of hospitalization, and premature mortality.

3. I am further aware that air pollution, including ozone and its precursors, can negatively affect the health of wildlife and plant life that I and the Center's other members appreciate viewing in the outdoors. I am aware that such air pollution can also lead to haze and negatively affect my and the Center's other members' experiences in nature and the outdoors, and can lead to broader ecosystem effects by affecting water quality and nutrient cycles.

4. I have family in Maricopa County, Arizona, within the ozone nonattainment area, and so I regularly visit there and will continue to do so on a regular basis in the future. My mother lives in Scottsdale, Arizona, in Maricopa County. My mother is in her 80s, which makes her part of the class of people who the United States Environmental Protection Agency ("EPA") has repeatedly determined are particularly sensitive to ozone pollution. I regularly visit my

mother and will continue to do so for the foreseeable future. My next trip to visit my mother will be no later than November 2026. I am very concerned about the adverse impact ozone pollution is having on my mother's health and well-being.

5. My brother lives in Phoenix, Arizona, in Maricopa County, within the ozone nonattainment area. He is diabetic. Because ozone precursors, which are what is actually regulated to control ozone, also contribute to particulate matter formation, he is particularly at risk from EPA's failure to timely implement required ozone regulations. I regularly visit my brother and will continue to do so on a regular basis. My next trip to visit my brother will be no later than November 2026.

6. On my regular trips to Maricopa County, I engage in a variety of outdoor physical activities. I often go hiking and will continue to do so in the future. I hike in the McDowell Mountain Regional Park and Tonto National Forest. I also walk around Scottsdale. I will continue to engage in these activities. Ozone pollution in Maricopa County has adverse effects on me, my family, and the outdoor surroundings where I enjoy hiking, walking, and spending time. Vacatur of EPA's approval of the 179B demonstration for the Phoenix nonattainment area will benefit me, my family, and other members of the Center by ensuring Maricopa County will take the steps necessary to reduce ozone pollution levels in the area to safer levels.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 8, 2026

*s/ Robert Ukeiley*
Robert Ukeiley

# ATTACHMENT 6

## Gina Trujillo Declaration

**DECLARATION OF GINA TRUJILLO**

I, Gina Trujillo, declare as follows:

1. I am the Managing Director of Membership at the Natural Resources Defense Council, Inc. ("NRDC"). I have directed the Membership department since 2015, and I have worked in NRDC's membership department for more than 30 years. My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission. My duties also require that I be very familiar with the database in which information on NRDC members is regularly maintained.

2. NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

3. NRDC's mission statement declares that "NRDC works to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends." The mission statement goes on to declare that NRDC combines the power of its members and experts "to confront the climate crisis, protect the planet's wildlife and wild places, and to ensure the rights of all people to clean air, clean water, and healthy communities."

4. Through its programs aimed at protecting human health and the environment, NRDC has a long history of advocacy and litigation to effectuate the Clean Air Act's various statutory programs, including the national ambient air quality standards, or NAAQS, for ozone.

5. When an individual becomes a member of NRDC, their current residential address is recorded in NRDC's membership database. When a member renews their

membership or otherwise makes a contribution to NRDC, the database entry reflecting the member's residential address is verified or updated.

6. NRDC currently has more than 500,000 members nationwide. There are NRDC members residing in each of the fifty states, and in the District of Columbia and Puerto Rico.

7. NRDC also has members living in the Phoenix-Mesa nonattainment area that is in violation of the federal 2015 standard for ozone pollution. This includes 2,430 members in Maricopa County, Arizona.

8. When an individual becomes a member of NRDC, he or she authorizes NRDC to take legal action on his or her behalf to protect the environment and public health.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

September 15, 2026

Gina Trujillo

Gina Trujillo

# ATTACHMENT 7

## Jacquelyne Quayle Declaration

# DECLARATION OF JACQUELYNE QUAYLE

I, Jacquelyne Quayle, hereby declare as follows:

1. My name is Jacquelyne Quayle. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. I am a current member of the Natural Resources Defense Council ("NRDC"), and I have been a member since 2021.

3. I have always been concerned about air pollution in both my community and other communities. As I grew up during a time before the Environmental Protection Agency (EPA) existed, I know the impact pollution can have on communities when there are inadequate regulations on industry.

4. My sister and I reside at our home in Phoenix, Arizona, which is located in Maricopa County. I have lived at my current address since 2003.

5. In the Phoenix area, there is a significant number of vehicles on the road. Maricopa County is also a hub for industrial activity, data centers, and power plants.

6. Emissions from these sources interact with sunlight to produce ground level ozone. On average, Arizona has more sunlight and less cloud cover than any other state in the nation. As a result, Maricopa County, including the Phoenix area, is heavily polluted with smog.

7. I spend a significant amount of time outside. I am an avid gardener, but due to growing pollution concerns, I have limited my time outdoors.

8. I am particularly concerned about air pollution because I have asthma and coronary heart disease. Additionally, as an elderly person, I am aware the adults aged 65 and older are highly vulnerable to ground-level ozone pollution.

9. As a retiree, I am on a fixed income and must be mindful of the costs of medication and treatment for my health conditions, even when they are exacerbated by air pollution.

10. When I am outside, I observe dirty exhaust from traffic on the freeway and main thoroughfare near my home. I am concerned about the smog that I see and breathe.

11. I am familiar with ozone pollution, and its adverse health effects. I am aware that this pollution comes from vehicles on the road, industrial sources, and power plants such as those located in Maricopa County. I am also aware of the serious health implications of exposure to ozone pollution, including asthma, bronchitis, increased risk of respiratory disease and even premature death.

12. Because of my concerns about air pollution, I check my local news channel for both the weather every day and whether there are warnings and alerts relating to air quality in my community.

13. On high ozone days, I stay indoors, and I avoid my usual outdoor activities such as gardening. I also run an air purifier inside my home because of the air pollution.

14. I am aware that in 2015, EPA issued updated and strengthened national ambient air quality standards for ozone. NRDC staff have informed me that Maricopa County does not meet the strengthened primary ozone standard of 70 parts per billion.

This means that the air in Maricopa County contains unhealthy levels of ozone pollution, which will expose me, my family, and my community to detrimental health effects.

15. The 2015 standards protect from exposure to ozone pollution, and I am concerned that any failure to ensure compliance with the standards, endangers my health and welfare, and that of my family and community. For these reasons, I fully support NRDC's litigation to ensure proper, timely implementation of the updated ozone standards in Maricopa County. I understand that if the court vacates EPA's decision, Arizona will need to take additional steps to reduce ozone pollution, and that will benefit me by reducing my exposure to such harmful air pollution.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

Signature: Jacquelyne Quayle (Sep 27, 2026 02:50:52 PDT)

Ms. Jacquelyne Quayle

# ATTACHMENT 8

## Lisa Ricker Declaration

# DECLARATION OF LISA RICKER

I, Lisa Ricker hereby declare as follows:

1. My name is Lisa Ricker. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. I am a current member of the Natural Resources Defense Council ("NRDC"), and I have been a member since January 2013. Protecting the environment is important to me because I have always valued spending time outdoors and understand the impacts we can have on our habitat.

3. My husband and I reside at our home in Tempe, Arizona, which is located in Maricopa County. I have lived at my current address since 1995.

4. There are a significant number of vehicles and freeways near my home, correlating with the high population growth in my community over the years. There is also an industrial area near my home, and Maricopa County generally is a hub for industrial activity, data centers, and power plants.

5. Emissions from these kinds of sources interact with sunlight to produce ground level ozone. On average, Arizona has more sunlight and less cloud cover than any other state in the nation. As a result, Maricopa County, including the Mesa area, is heavily polluted with smog.

6. I have often smelled a bad odor outside, and I am familiar with ozone pollution and its adverse health effects. I am aware that this pollution comes from vehicles on the road, industrial sources, and power plants such as those located in Maricopa County. I am also aware of the serious health implications of exposure to

ozone pollution, including asthma, bronchitis, increased risk of respiratory disease and even premature death.

7. My husband and I enjoy spending time outside. My husband plays outdoor sports three times a week, and I take a walk almost every day. We are also avid gardeners.

8. When the air quality is bad, my husband and I are forced to stay inside and limit our various daily outdoor activities. I am particularly concerned about air pollution because I have a congenital heart issue and am trying to keep my lungs healthy because I am worried about lung disease. Additionally, my husband is an elderly person, and I am aware the adults aged 65 and older are highly vulnerable to ground-level ozone pollution.

9. Because of my concerns about air pollution, I consistently monitor warnings and alerts relating to air quality on an app on my phone. I am also considering installing a house-wide air filter system.

10. I am aware that in 2015, EPA issued updated and strengthened national ambient air quality standards for ozone. NRDC staff have informed me that Maricopa County does not meet the strengthened primary ozone standard of 70 parts per billion. This means that the air in Maricopa County contains unhealthy levels of ozone pollution, which will expose me, my family, and my community to detrimental health effects.

11. The 2015 standards protect from exposure to ozone pollution, and I am concerned that any failure to ensure compliance with the standards, endangers my health and welfare, and that of my family and community. For these reasons, I fully

support NRDC's litigation to ensure proper, timely implementation of the updated ozone standards in Maricopa County. I understand that if the court vacates EPA's decision, Arizona will need to take additional steps to reduce ozone pollution, and that will benefit me and my husband by reducing our exposure to such harmful air pollution.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

Signature: Lisa Ricker (Sep 19, 2026 08:51:02 PDT)

Dr. Lisa Ricker